TRAYLOR, Justice.
 
 *
 

 _JjOn December 13, 2001, a Calcasieu Parish grand jury indicted the defendant, Jason Reeves, for the first degree murder of a four year old girl, identified as M.J.T., which occurred on November 12, 2001, in violation of La. R.S. 14:30. Reeves’ first trial began with jury selection on October 27, 2003, and ended in a mistrial on November 9, 2003.
 

 Reeves’ retrial commenced with jury selection on October 12, 2004. On November 5, 2004, the jury returned a unanimous verdict of guilty as charged. After a penalty phase hearing, the same jury unanimously recommended a sentence of death after finding as aggravating circumstances: (1) the defendant was engaged in the perpetration or attempted perpetration of aggravated rape; (2) the victim was under the age of twelve years; and (3) the. offense was committed in an especially heinous, atrocious or cruel manner. On December 10, 2004, after denying post-verdict
 
 *1036
 
 motions, the trial court imposed the sentence of death in accordance with the jury’s verdict.
 

 The defendant now brings the direct appeal of his conviction and sentence to |2this court pursuant to La. Const. art. 5, § 5(D).
 
 [1]
 
 After a thorough review of the law and the evidence, we find that none of the arguments put forth by the defendant constitute reversible error, and affirm the defendant’s conviction and sentence.
 

 FACTS
 
 [2]
 

 No challenge is raised to the sufficiency of the evidence used to convict the defendant of first degree murder. After our review of the record, we find the following facts to be proved beyond a reasonable doubt.
 

 On November 12, 2001, at approximately 3:15 p.m., the Calcasieu Parish Sheriffs Office (CPSO) received a complaint of a suspicious vehicle at a school in Moss Bluff, Louisiana. The vehicle was described as a blue four-door, older model vehicle which may have been an Oldsmobile Cutlass. The driver of the vehicle, who was described as wearing a maroon t-shirt and blue jeans, was loitering in the parking lot of the school and conversing with two young female students. The complaint included the license plate number of the suspicious vehicle. A check on the license plate revealed that the defendant, Jason Manuel Reeves, was the owner of a blue Oldsmobile Cutlass, with the same license plate number, and that he had a criminal history of sexual offenses with minors.
 

 Shortly thereafter, at 5:02 p.m., the CPSO received a 911 call from the mother of a four-year old girl, M.J.T., who had disappeared from McFatter Trailer Park in|3Moss Bluff.
 
 [3]
 
 The trailer park is located 3 miles from the school where the suspicious vehicle had been reported. The young girl’s mother, C.T., told sheriffs deputies that she had seen a suspicious, older model, blue vehicle circling the trailer park prior to the time she realized her daughter was missing. She also remembered a red sticker in the vehicle’s rear window. C.T. later identified Reeves’ vehicle as the one she saw in the trailer park on November 12, 2001.
 

 That evening, CPSO deputies went to Reeves’ home and obtained permission from him, and his mother with whom he lived, to search his vehicle and home. After finding no evidence
 
 connecting
 
 Reeves to the missing girl, the deputies informed Reeves of his constitutional rights and
 
 *1037
 
 asked him to go to the sheriffs office for further questioning. Reeves agreed and followed the deputies in his own car to the CPSO because he did not know where the sheriffs office was located.
 

 Reeves arrived at the CPSO at approximately 10:20 p.m., was informed of his constitutional rights, and signed a form waiving them. He was initially questioned from 10:45 p.m. until 12:40 a.m.
 
 [4]
 
 Thereafter, Reeves was taken to an interview room in the detectives’ area, which is a secure area.
 
 [5]
 
 Reeves was again informed of his constitutional rights and was questioned throughout the night with regard to his whereabouts and activities on November 12, 2001.
 

 Reeves told the officers that he had finished work at approximately 3 p.m., ^purchased a drink at a gas station, and driven home, arriving at approximately 4 p.m. Judy Doucet, the defendant’s mother, told sheriffs deputies that she specifically remembered her son arriving home around 5:00 p.m. or 5:30 p.m. Throughout questioning, Reeves continually denied any involvement with the missing girl. These statements were not recorded.
 

 From the time M.J.T. was reported missing until sometime on November 13, 2001, individuals assisting in the search for M.J.T. recovered evidence from a creek located approximately 15 minutes from McFatter Trailer Park, near a wooden bridge on Charles Breaux Road. The victim’s mother identified a pair of a child’s white tennis shoes and a pair of girl’s purple pants as having been worn by M.J.T. at the time of her disappearance.
 

 On November 13, 2001, at 9:16 a.m., deputies obtained Reeves’ permission to obtain his bodily substances for testing, then transported him to a local hospital where the requested samples were obtained. A nurse collected blood samples, oral swabs, pubic hair combings and fingernail scrapings from Reeves. A physical examination of Reeves at this time showed scratches on the inside of his left upper thigh, on his nose, and on his arms. He also had abrasions on both knees.
 

 Around 11:40 a.m. on November 13, 2001, Reeves was placed under arrest on an outstanding warrant from another parish. At that time, Reeves was again informed of his constitutional rights, interrogated further, and then placed in the jail. During this interview, a detective made the statement that only two people knew what really happened to M.J.T. Reeves replied, “Yeah, me and the good Lord.”
 
 [6]
 
 Despite making this statement, Reeves continued to deny involvement with the disappearance of M.J.T.
 

 |BOn November 14, 2001, at approximately 11 a.m., deputies took Reeves from his jail cell to the detectives’ interview area where he was again
 
 Mircmdized.
 
 Reeves continued to deny involvement with the missing girl but further details which had emerged in questioning were now preserved on videotape. While still maintaining he finished work around 2:30
 
 *1038
 
 p.m. or 3:00 p.m., he related that he had driven in the direction of the Chardele Trailer Park to visit his cousin, but turned around when he realized he did not know his cousin’s trailer number. Reeves then headed back in the direction of Moss Bluff, stopping at a convenience store to purchase a Mountain Dew soft drink. He claimed he traveled along a highway toward his grandfather’s house, but remembered
 
 en route
 
 that his grandfather would not be home. Reeves then claimed he turned around in the parking lot of a Moss Bluff school, speaking briefly to a woman there. He continued traveling and stopped along the way at McFatter Trailer Park to see an old friend, Kurt Leger, with whom he had worked offshore. He asked a group of children at the trailer park if they knew where his friend Kurt lived. Reeves then claimed his car overheated, so he waited for the vehicle to cool down before driving home, where he claimed to have arrived by 4:00 p.m. This statement concluded when lunch was brought to Reeves at 12:40 p.m.
 

 At approximately 2:30 p.m. on November 14, 2001, the body of M.J.T. was found in a secluded area in some woods, 10-15 yards off a trail next to LeBleu Cemetery. The cemetery is located approximately 8.2 miles from McFatter Trailer Park.
 
 [7]
 
 A Mountain Dew soft drink bottle was recovered approximately 25 feet away from where the body was found. The little girl’s body, clothed only in a purple shirt [r,pulled up halfway and naked from the waist down, had been stabbed multiple times. M.J.T. was found lying on her back with her legs bent, with signs of sexual abuse evident. Before evidence was gathered or the body was touched, law enforcement officers videotaped the crime scene.
 

 Interrogation of’ Reeves began again around 8 p.m. Former FBI Agent Don Dixon confronted Reeves with photographs of M.J.T.’s body taken at the murder scene. As a pre-arranged strategy, Agent Dixon told Reeves that a latent print found on a palmetto leaf tied him to the murder scene.
 
 [8]
 
 At 9:25 p.m., detectives began videotaping the interview, during which Reeves confessed to having the girl in his car and taking her to the cemetery. He walked with her into the nearby woods, where they sat down and watched a rabbit. Reeves whittled a piece of wood with his pocket knife. Reeves then claimed he blacked out and does not remember doing anything else to the little girl. The next thing Reeves remembers was walking toward his car parked in the cemetery’s parking lot, stopping at his sister’s grave, saying good-bye and that he was sorry. When he reached his car, he noticed his pants were unzipped and his knife was missing.
 

 Reeves had requested to speak with his mother. At 10:40 p.m., the videotape was stopped when Reeves’ mother arrived at the sheriffs office. One of the detectives
 
 *1039
 
 monitored Reeves’ conversation with his mother and heard Reeves say, “I did this thing. I don’t know why, but I did it.”
 
 [9]
 

 Thereafter, Reeves indicated that he wanted to finish the interview because his actions had hurt his mother and the victim’s family. Reeves was
 
 Mirandized,
 
 again |7and continued his statement at 11:12 p.m. He expanded his earlier statements and acknowledged that he picked up M.J.T. to “go fool with her.” He took her to the cemetery since the cemetery was a secluded place. After visiting his sister’s grave and becoming very angry, Reeves took M.J.T. to the woods and started touching her on her bottom. Reeves admitted he told M.J.T. throughout the encounter that he would bring her back home and other things in an attempt to calm her down. M.J.T. became upset and asked him to stop, which further angered Reeves, who was still wielding his knife. Although he claimed he did not remember taking off M.J.T.’s pants or assaulting her, Reeves acknowledged that he was the only person who could have stabbed her. Reeves hurried out of the cemetery, fearing that M.J.T. was not alive when he left her. He does not remember anything about disposing of her pants and shoes. He does remember driving home with dirt and possibly a light smear of blood on his arms. He rinsed off his arms with the outside hose before entering his house and seeing his mother, then took a bath. The statement concluded at 11:48 p.m. Reeves was subsequently arrested for aggravated kidnaping and first degree murder.
 

 On December 13, 2001, a Calcasieu Parish grand jury indicted Jason Reeves for the first degree murder of M.J.T. Specifically, the indictment states: “JASON MANUEL REEVES committed the offense of first degree murder in that he killed M.J.T., a female juvenile whose date of birth was March 25, 1997, with the specific intent to kill or inflict great bodily harm upon M.J.T. and was engaged in the perpetration or attempted perpetration of aggravated rape and/or M.J.T. was under the age of twelve years.”
 
 [10]
 

 At the guilt phase of this first degree murder trial, the state presented Reeves’ | ^videotaped statements to the jurors and evidence discovered through investigation. A maroon t-shirt and jeans, which the defendant had worn on November 12, 2001, were seized from his house. Reeves’ mother had washed them before the police seized the items. A picture of Reeves’ vehicle, admitted into evidence, shows that the vehicle is a blue four-door, older model Oldsmobile Cutlass with a red sticker on the back window.
 

 Two girls from the Moss Bluff school testified the defendant tried to talk to them on November 12, 2001. One of the girls, and the after-care provider who spoke with Reeves that day, identified him as the person who had been at the school near where M.J.T. disappeared.
 

 In addition, an off-duty Lake Charles city police officer testified that he saw Reeves at the cemetery at 4:40 p.m. on November 12, 2001. The officer, who was meeting with a confidential informant at the cemetery between 4:15 p.m. and 4:45 p.m., saw the defendant walking back to his car and leaving the cemetery parking lot. As Reeves drove right next to the officer in leaving the area, the two men came face-to-face with each other. The
 
 *1040
 
 officer identified Reeves in court as the man he saw at the cemetery at 4:40 p.m. on November 12, 2001.
 

 The state presented testimony that a man-trailing dog identified the scent of the victim inside Reeves’ vehicle. The man-trailing dog also followed Reeves’ scent to a wooden bridge off Charles Breaux Road, under which the pants and shoes of M.J.T. were found in a creek. At the cemetery, the man-trailing dog went toward the water, then toward the woods and over the fence from the cemetery to the area where there were wood shavings on the ground. From there, the dog went to the place where the victim was found. At that point, the dog started whining and crying, and refused to go further. At each location, the dog’s handler was given no information.
 

 |9The state presented expert testimony that the purple fibers from the victim’s clothing matched fibers of vacuumed debris evidence from Reeves’ vehicle. Hairs identified as dog hairs were found both in the defendant’s vehicle and on the victim’s clothing. During the recovery of evidence at the crime scene, maggots and an adult fly were recovered from the victim’s body. An entomologist estimated that eggs were laid on the victim’s body within one hour of her death and that the last time the eggs could have been laid considering their development was at approximately 5 p.m. on November 12, 2001.
 

 The coroner testified that the approximate time of M.J.T.’s death was 4:30 p.m. The cause of death was found to be multiple incised stab wounds of the neck and trunk. M.J.T.’s neck had been cut nearly two-thirds of the way around.
 
 [11]
 
 In total, the victim had sixteen stab wounds, with fourteen on the front of her body and two on her back. Six of the stab wounds were in the area of the heart, while the heart itself was stabbed five times. The wounds to M.J.T.’s heart and back occurred while she was alive, although the stab wounds around her liver and mid-section occurred following death. There were long scrapes along the entire length of the victim’s legs, which showed M.J.T. could have been dragged along the ground. Injuries on M.J.T.’s right hand were consistent with defensive wounds, showing that the little girl attempted to protect herself. Although she had been stabbed in the heart, the coroner believed M.J.T. would have survived for some time and would have suffered throughout the attack.
 

 M.J.T.’s body also showed she had been brutally sodomized while she was alive. Three visible scrapes and blood were visible on her anus. The forcible widening or opening of her anus was approximately three-fourths of an inch in | ,ncircumference. Her body showed blue bruising around her bottom, which the coroner stated could only occur when blood is pumping and the victim is alive. Semen was found in the victim’s anus. An expert forensic analyst matched the semen obtained from a rectal swab of the victim to Reeves’ DNA profile. The expert testified the probability of finding the same DNA profile from another Caucasian individual other than Reeves was calculated as 1 in 256 trillion.
 

 After the state presented its evidence in the guilt phase, the defendant called, as a witness, an expert forensic psychologist, who testified as to his opinions regarding the reliability of the defendant’s confession.
 

 After deliberating, the jury unanimously found that the state had proven beyond a reasonable doubt that Reeves committed the first degree murder of M.J.T. After
 
 *1041
 
 allowing the statutorily-required time period to elapse, the penalty phase of the trial began.
 

 At the penalty phase, the state introduced Reeves’ prior criminal record, which included two juvenile adjudications for simple burglary and two adult convictions for indecent behavior with a juvenile, in 1996 and 1997, respectively. The victim of the 1996 conviction, N.T., testified that when she was 15 years old, the defendant drove her in his truck to a park. He pulled her pants down as she struggled against him. N.T. stopped his assault only when she bit Reeves on the shoulder so hard that he bled. The record of the 1996 conviction shows that Reeves’ victim, S.D., was a 7 year old child.
 

 Further, the state presented testimony from a young girl, W.H., who described her encounter with Reeves on November 8, 2001, four days prior to M.J.T.’s disappearance and murder. W.H. stated that she was 13 years old on that date. She was walking to the office at Moss Bluff Middle School near the end of the school day |nwhen Reeves, walking past her in the opposite direction, grabbed her bottom. She ran quickly to the school’s office to get help.
 

 The state also presented the testimony of Detectives Zaunbrecher and Primeaux of the CPSO. Both detectives testified that on December 10, 2001, Reeves had stated, in their presence, that he would not serve life in prison. While making a slitting motion across his neck, Reeves told the detectives that he would make them wish they had given him the death penalty if he did not get it. Reeves stated, “What are they gonna do, give me the — give me life in prison twice?”
 
 [12]
 
 Further, Deputy Mandy Taggert, a CPSO transportation deputy, testified that Reeves told her that if he got out of jail, he would find another child and would kill again. Deputy Tag-gert stated that Reeves then began smiling and laughing after making that statement.
 

 The defense presented testimony from an expert in forensic psychology who asserted that Reeves suffers from major depression and mixed personality disorder, with borderline and anti-social personality traits. The defense expert testified that Reeves exhibits signs of dissociative amnesia stemming from chronic post traumatic stress disorder. The expert claimed that Reeves developed these disorders after witnessing his sister’s death and being sexually assaulted as a young boy. Additionally, another defense expert determined that Reeves has an aggressive attitude and is prone to verbal and physical aggression. That defense expert testified, further, that the defendant also exhibits emotional instability, volatile interpersonal relationships, anger, mood swings and impulsivity. The defense expert did not find Reeves to be psychotic, schizophrenic, delusional or prone to hallucinations, or otherwise suffering from a mental illness.
 

 The state’s forensic psychology expert countered that, from a psychiatric or I ^psychological standpoint, he did not see a causative trigger which resulted in Reeves’ criminal behavior. He did not feel that Reeves’ actions in raping and murdering M.J.T. were a result of a post traumatic stress disorder. Rather, the state expert asserted that Reeves possessed the ability to discern and appreciate right from wrong. The state expert also discounted the defense expert’s diagnosis of dissociative amnesia. According to the state expert, dissociative amnesia relates back to the traumatic events occurring previously in a person’s life rather thán to current memory lapses.
 

 
 *1042
 
 After deliberation, the jury unanimously recommended that Reeves be sentenced to death, finding the victim was under 12 years old; the murder was committed during the perpetration or attempted perpetration of an aggravated rape; and the offense was committed in an especially heinous, atrocious or cruel manner. After denying post-verdict motions, the trial court formally sentenced the defendant to death on December 10, 2004.
 

 The defendant now appeals his conviction and sentence, raising 79 assignments of error. The court will discuss Assignments of Error 1-7 within the body of the main opinion. These claims raise questions regarding the defendant’s counsel and are the only issues orally argued to this court. The remaining assignments of error, which have been determined to be without merit upon the application of well-established legal principles, are analyzed in an unpublished appendix which will comprise part of the record of this case on appeal. Finding no reversible error, we affirm Reeves’ conviction of first degree murder and sentence of death.
 

 LAW AND DISCUSSION
 

 Assignments of Error 1-7
 

 Attorney Issues
 

 In these interrelated assignments of error, the defendant complains that he was | ^unconstitutionally denied counsel of his choice when the trial court removed non-local counsel, who represented him at his first trial through an agreement with the local indigent defender board, and reinstated originally appointed counsel, the local chief public defender, for his retrial. This replacement occurred after non-local counsel requested the court’s involvement to secure reimbursement of expenses incurred in the defense of Reeves in the first trial, and to locate funding for expert assistance and attorney expenses for the retrial. The defendant additionally asserts the removal of non-local counsel resulted in representation by counsel who had an actual conflict of interest and who was so overburdened as to be constitutionally ineffective. The defendant maintains these actions resulted in structural error in his retrial, necessitating reversal of his conviction and sentence.
 

 Prior Jurisprudence
 

 Before discussing the merits of these issues, a brief review of this court’s jurisprudence in the area of indigent representation and funding is useful. In the past, this court has noted, in general, the chronic underfunding of indigent defense programs in most areas of the state.
 
 See State v. Peart,
 
 621 So.2d 780, 789 (La.1993);
 
 State v. Wigley,
 
 624 So.2d 425, 429 (La.1993). In addition to underfunding, this court has recognized that caseload levels of attorneys working within indigent defense programs have, in certain situations, resulted in constitutionally ineffective assistance of counsel.
 
 Peart,
 
 621 So.2d at 790. Although not applicable to this defendant’s trial, the legislature recently addressed these issues in comprehensive legislation.
 
 [13]
 
 Prior to the passage of the legislature’s reforms, this court, in cases |14reviewed by this court, set forth certain principles and remedies through its constitutional authority and inherent power to ensure that effective assistance of counsel had been provided for indigent
 
 *1043
 
 defendants. These jurisprudential principles and suggested remedies were the guidelines used by the district court in connection with Reeves’ retrial and form the framework of the district court’s decisions.
 

 State v. Peart
 

 In 1993, in
 
 State v. Peart, supra,
 
 this court considered a multifaceted ruling made by a criminal district court judge in Orleans Parish based on that judge’s examination of the defense services being provided to indigent defendants in that section of court by the public defender’s office. The trial judge ruled that three statutes regarding indigent defense and its funding were unconstitutional as applied in the City of New Orleans. In addition, the trial judge ordered that the legislature provide funding for improved indigent defense services and ordered a reduction in the caseloads of those attorneys representing indigent defendants in that section of court.
 
 Peart,
 
 621 So.2d at 783.
 

 This court reversed the district court’s ruling, finding that the statutes at issue were not unconstitutional and that the remedies ordered by the trial judge were inappropriate at that time.
 
 Id.
 
 However, in
 
 Peart,
 
 this court made several important pronouncements regarding the funding of indigent defense and the caseloads of those attorneys providing defense to the indigent, which are pertinent to the issues raised in the instant matter.
 

 In
 
 Peart,
 
 this court held,
 
 inter alia,
 
 that a defendant may raise certain ineffective assistance of counsel claims, prior to trial, when judicial economy demands it.
 
 Id.,
 
 621 So.2d at 787. Additionally, the court held that a trial judge must make findings individually tailored to each defendant with regard to the | ^representation he received or was receiving.
 
 Id.,
 
 621 So.2d at 788. The court also held, after a detailed review of the lack of funding and excessive caseloads of the indigent defenders in that particular section of Orleans Parish Criminal District Court, that defendants who were assigned counsel in that section received constitutionally deficient counsel.
 
 Id.,
 
 621 So.2d at 790. So finding, the court further held that a rebuttable presumption of counsel’s ineffectiveness could be applied in cases arising out of that section of court.
 
 Id.,
 
 621 So.2d at 791. Finally, the court warned:
 

 If legislative action is not forthcoming and indigent defense reform does not take place, this Court, in the exercise of its constitutional and inherent power and supervisory jurisdiction, may find it necessary to employ the more intrusive and specific measures it has thus far avoided to ensure that indigent defendants receive reasonably effective assistance of counsel.
 

 Id.,
 
 621 So.2d at 791. The court remanded the case to the district court for retrial of the “Motion for Relief’ filed on behalf of defendant, Peart, and for trial of other motions filed by indigent defendants in that section of court asserting pretrial claims of ineffective assistance of counsel.
 
 Id.,
 
 621 So.2d at 791. In fashioning a remedy, this court instructed the district court:
 

 If the court, applying this presumption [of counsel ineffectiveness] and weighing all evidence presented, finds that Leonard Peart or any other defendant in [that section] is not receiving the reasonably effective assistance of counsel the constitution requires, and the court finds itself unable to order any other relief which would remedy the situation, then the court shall not permit the prosecution to go forward until the defendant is provided with reasonably effective assistance of counsel.
 

 Id.,
 
 621 So.2d at 791-792.
 

 State v. Wigley
 

 While
 
 Peart
 
 dealt with a local public defender’s office representing indigent de
 
 *1044
 
 fendants, the case of
 
 State v. Wigley,
 
 624 So.2d 425 (La.1998), decided the same year as
 
 Peart,
 
 concerned the appointment of attorneys from the private bench to represent indigent defendants. In
 
 Wigley,
 
 the court reaffirmed that the 116“[u]ncompensated representation of indigents, when reasonably imposed, is a professional obligation burdening the privilege of practicing law in this state, and does not violate the constitutional rights of attorneys.”
 
 Id.,
 
 624 So.2d at 426. However, in order for the appointment to be reasonable, and not oppressive, the court also held that “any assignment of counsel to defend an indigent defendant must provide for reimbursement to the assigned attorney of properly incurred and reasonable out-of-pocket expenses and overhead costs.”
 
 Id.,
 
 624 So.2d at 429. The court charged the district judges with the authority to determine, in their discretion, what would constitute an unreasonable level of time that an attorney must devote to a particular case without compensation of a fee. “Such a system will strike a balance between the attorney’s ethical duty to provide services
 
 pro bono publico
 
 and his or her practical need to continue to perform his or her other obligations.”
 
 Id.,
 
 624 So.2d at 429.
 

 The court in
 
 Wigley
 
 levied another
 
 charge on the
 
 district courts. While acknowledging the fact that the source of funds from which appointed counsel may be reimbursed were, at that time, limited, the court directed the district judges to make the initial determination, before counsel is appointed, that sufficient funds “to cover the anticipated expenses and overhead are likely to be available to reimburse counsel.”
 
 Id.,
 
 624 So.2d at 429. Moreover, the court instructed that “[i]f the district judge determines that funds are not available to reimburse appointed counsel, he should not appoint members of the private bar to represent indigents.”
 
 Id.
 
 Recognizing the harshness of this remedy, the court nevertheless maintained that “budget exigencies cannot serve as an excuse for the oppressive and abusive extension of attorneys’ professional responsibilities.”
 
 Id.
 

 1
 
 7State v. Touchet
 

 Peart
 
 and
 
 Wigley
 
 set forth remedies to ensure constitutionally-required assistance of counsel for indigent defendants. In addition to the right to counsel, an indigent defendant must also have a fair opportunity to present his defense.
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 77, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985). This often requires the assistance of expert witnesses. When a defendant is indigent, he must obtain funding to pay for this expert assistance. However, in requesting certain types of expert assistance, the defense may be divulging important trial strategies.
 

 In
 
 State v. Touchet,
 
 1993-2839 (La.9/6/94), 642 So.2d 1213, the court considered whether, and to what extent, indigent defendants were entitled to
 
 ex parte
 
 hearings on their motions for state-funded expert witness services. In making its determination, the court sought to provide an indigent defendant a fair opportunity to present his defense while maintaining an adversary system. The proper balance is achieved by the court’s holding:
 

 ... an indigent defendant may file a motion for expert funding
 
 ex parte.
 
 Notice of the filing of the motion should be given to the state, which may file an opposition to the hearing being held
 
 ex parie
 
 and/or to the request for funding. The trial court should first determine,
 
 in camera,
 
 either on the face of the allegations of the motion or upon taking evidence at an
 
 ex pavte
 
 hearing, whether the defendant would be prejudiced by a disclosure of his defense at a contradic
 
 *1045
 
 tory hearing. If so, then the hearing on expert funding should continue
 
 ex parte.
 
 If not, then the hearing should be held contradictorily with the District Attorney. ...
 

 At the hearing on expert funding, whether
 
 ex parte
 
 or contradictory, the defendant must first show a need for the funding. The defendant must show with a reasonable degree of specificity what type of expert is needed and for what purpose. In other words, the indigent defendant requesting governmental funding for the securing of expert assistance must show that it is more likely than not that the expert assistance will be required to answer a serious issue or question raised by the prosecution’s or defense’s theory of the case. If the defendant meets this burden, then the court is to order that the funds be provided by the state. If the defendant fails to meet this burden, and the proceedings were held
 
 ex parte,
 
 both the written reasons for denial and 118the record of the proceedings are to remain under seal during the pendency of the defendant’s prosecution, including appellate review.
 

 Touchet,
 
 1993-2839 p. 14-15, 642 So.2d at 1221.
 

 In
 
 Touchet,
 
 this court recognized that a district court must use its discretion in its decisions regarding the funding of expert assistance for indigent defendants. While noting that the state’s substantial interest in protecting the public fisc demands that some form of opposition by the state be allowed,
 
 Touchet
 
 declared the district court to be an adequate guardian of the state’s financial interests from frivolous requests for the funding of expert assistance.
 
 Id.,
 
 1993-2839 p. 12, 642 So.2d at 1220-1221.
 

 State v. Citizen
 

 Finally, the case of
 
 State v. Citizen c/w State v. Tonguis,
 
 2004-1841 (La.4/1/05), 898 So.2d 325
 
 (“Citizen”)
 
 is important in this review. Although
 
 Citizen
 
 was handed down a few months after Reeves’ retrial, these consolidated cases involved the separate prosecutions of two indigent capital defendants arising out of Calcasieu Parish, the same parish as Reeves’ prosecution, and present an informative analysis of the mechanism for funding indigent defense prevailing at that time within that parish.
 

 In
 
 Citizen,
 
 a parish-approved
 
 ad valo-rem
 
 tax constituted the largest component of the parish Criminal Court Fund, which maintained the court system and the District Attorney’s Office, but not the local public defender’s office. This fund operated at a surplus. By contrast, the local public defender’s office was funded through court fees and an allocation of state funds and operated at a deficit. Expressing frustration at the continued lack of funding in criminal cases, and faced with appointed defense counsel’s Motion to Determine Source of Funds to Provide Competent Defense, the district court in
 
 Citizen
 
 declared unconstitutional two statutes that had recently been 1^amended to prevent the use of local parish funds to pay for appointed defense counsel. The district court further ordered the parish police jury to provide funds for appointed counsel for the two indigent capital defendants.
 
 [14]
 

 
 *1046
 
 On appeal, this court reversed, upholding the constitutionality of the statutes. The court held that the legislature, through statute, places the burden of paying indigent defense costs on the state. The fact that the legislature failed to adequately fund indigent defense programs, and had, in the amendments to the statutes at issue, eliminated an alternative source of funding from the parishes, did not “diminish any of the constitutionally guaranteed rights and freedoms of these defendants or of their attorneys.”
 
 Citizen,
 
 2004-1841 p. 13, 898 So.2d at 335. Further, the court held the district court erred in ordering the police jury to place funds into the court registry for court-appointed attorneys or other case-related expenses when the legislature had made unmistakably clear that the state, and not the parish, was responsible for indigent funding.
 
 Id.,
 
 2004-1841 p. 14, 898 So.2d at 336.
 

 In addition to these holdings, the court reiterated, from its previous pronouncements in
 
 Peart
 
 and
 
 Wigley,
 
 that “budget exigencies” could not serve as an excuse for the oppressive or abusive extension of attorneys’ professional responsibilities.
 
 Citizen,
 
 2004-1841 p. 15, 898 So.2d at 336. Moreover, in order to ensure that indigent defendants are provided with their constitutional and statutory rights to counsel and to expert assistance, this court had, in the past, exercised its | ^constitutional and inherent power and supervisory jurisdiction to impose corrective measures. In fact, the court warned previously in
 
 Peart
 
 that more intrusive measures would be contemplated if the legislature failed to act.
 
 Id.
 

 Although the court in
 
 Citizen
 
 noted that the legislature had taken positive steps since
 
 Peart
 
 to remedy the critical state of indigent criminal defense in Louisiana, there had been, as of that time, no resolution or legislative remedy for the underfunding and overworked conditions noted in previous cases.
 
 Id.,
 
 2004-1841 p. 14-15, 898 So.2d at 336. Finding that further corrective measures were needed to address the immediate problems of the instant defendants, the court in
 
 Citizen
 
 altered one of the rules set forth in
 
 Wigley.
 

 Whereas in
 
 Wigley
 
 the court maintained that a district court should not appoint private counsel for an indigent defendant until a funding source was identified for the reimbursement of, at a minimum, the appointed counsel’s expenses and overhead, the court in
 
 Citizen
 
 ordered that counsel be appointed for an indigent defendant from the time of the indigent defendant’s first appearance in court, “even if the judge cannot then determine that funds sufficient to cover the anticipated expenses and overhead are likely to be available to reimburse counsel.”
 
 Citizen,
 
 2004-1841 p. 16, 898 So.2d at 338. The court instructed that counsel appointed before a funding source was identified could subsequently file a motion to determine funding. Thereafter, if the district court determined that adequate funding was not available, this court authorized the defendant to file a motion to halt the prosecution until adequate funding became available.
 
 Id. Citizen
 
 authorized district judges, in their discretion, to prohibit the state from proceeding with a prosecution
 
 *1047
 
 until he or she would be able to determine that appropriate funding was likely to be available thereafter.
 
 Id.,
 
 2004-1841 p. 16, 898 So.2d at 339.
 

 21This authority is no longer a matter of jurisprudential rule announced in
 
 Citizen.
 
 In its comprehensive revision of the statutory provisions establishing and regulating a state-wide indigent defender board, the legislature, in the Louisiana Public Defender Act of 2007, La. Acts 2007, § 307, explicitly recognized that
 
 Citizen
 
 “authorized trial judges to halt prosecutions in capital cases, upon motion of defense counsel, until adequate funding is provided to ensure an adequate defense, and it is the express intention of the legislature to ensure adequate resources, consistent with the
 
 Citizen
 
 opinion, which allow prosecutions in such cases to continue to conclusion resulting in verdicts that are fair, correct, swift, and final.” La. R.S. 15:142(D). As previously noted, our decision in
 
 Citizen
 
 was rendered several months after the retrial of the instant case.
 

 Facts Pertinent To Funding And Representation In This Case
 

 With this jurisprudential review in mind, we turn to the facts pertinent to the issues raised in these assignments of error. The record shows that the Calcasieu Parish grand jury indicted Reeves on December 13, 2001. The district court determined that the defendant was indigent and the Calcasieu Parish Public Defender’s Office was appointed to represent him. At arraignment, the Chief Public Defender of the parish, Ronald Ware, tendered a plea of not guilty on Reeves’ behalf.
 
 [15]
 
 At that time, Ware informed the court that attorney David Ritchie would serve as co-counsel.
 
 [16]
 
 For several months, from January through March, 2002, Ware and Ritchie represented the defendant, filing preliminary discovery motions and appearing on his behalf at hearings.
 
 [17]
 

 | .^Thereafter, the Calcasieu Parish Public Defender’s Office, through the parish’s Indigent Defender Board, contracted with attorney Kerry Cuccia of the Capital Defense Project of Southeast Louisiana (“Capital Defense Project”), and members of his staff, to represent Reeves in his capital trial.
 
 [18]
 
 According to documents filed later under seal, the original contract contemplated that the Capital Defense Project would be paid by the parish’s Public Defender’s Office/Indigent Defender Board the amounts of $50,000 for attorney fees and $25,000 for expert witness fees. The amount agreed upon for expert witness fees was subsequently raised by an additional $10,000, to a total of $35,000.
 

 Reeves’ first trial, with Cuccia, Graham da Ponte and Hilary Taylor acting as counsel, and presided over by Judge Quienalty, began with jury selection on October 27, 2003 and ended on November 9, 2003,
 
 *1048
 
 when a mistrial was declared due to the jury’s inability to reach a unanimous verdict on guilt.
 
 [19]
 

 After the trial, by letter dated November 25, 2003, Cuccia informed Ware that the defense of Reeves had been more costly than anticipated.
 
 [20]
 
 Although the local Public Defender’s Office/Indigent Defender Board provided a total of $85,000 for Reeves’ defense in the first trial, as agreed upon, the actual cost was $120,537.08.
 

 In requesting reimbursement of the overage from Ware, Cuccia included a | ^breakdown of the actual costs. None of the total amount requested included attorney fees. However, the attorneys who participated in Reeves’ defense sought reimbursement from the Public Defender’s Office/Indigent Defender Board of expenses, specifically mileage, lodging, meals and unspecified other expenses. In addition, the itemization of costs from the first trial reflected that the total amount requested for the overage also consisted of fees for expert witnesses, fees for general and mitigation investigation, and litigation expenses.
 

 On January 7, 2004, soon after Cuccia’s request to Ware for reimbursement, the district court set a new trial date of June 14, 2004. The district court also set motion dates for the retrial, and ordered that Cuccia and da Ponte be notified. The defense subsequently filed several motions addressing the funding issues which had arisen.
 
 [21]
 
 On February 18, 2004, defense counsel and the state participated in a telephone conference with Judge Canaday, the judge now presiding over the matter. A minute entry of February 19, 2004 reflects that Cuccia agreed to submit to the court an
 
 ex parte
 
 itemized statement of expenses from the first trial.
 

 By letter dated February 19, 2004, Cuc-cia submitted to the court, under seal, an itemization of expenses and expenditures from the first trial, reflecting a balance owed the Capital Defense Project of $35,537.08. Cuccia also submitted, under seal, an estimate of $19,000 needed immediately for expert witnesses to begin work on the upcoming retrial, with a total estimate of $108,000 for both attorney expenses and expert witness fees for the retrial. None of the estimated cost of the retrial included an amount for attorneys’ fees; the Capital Defense Project attorneys only estimated reimbursement of anticipated expenses.
 

 [ 240n March 8, 2004, Cuccia filed a “Motion to Stay Proceedings For Lack Of Funds to Provide A Competent Defense,” asserting that the defense was unable to prepare for trial scheduled to begin on June 14, 2004.
 
 [22]
 
 In the motion, Cuccia asserted that counsel could not prepare and present a competent defense for Reeves due to the facts that: (1) the de
 
 *1049
 
 fense was owed a significant amount of money for unpaid expenses from the first trial, and (2) had received no money with which to fund the retrial. With regard to the unpaid expenses from the first trial, Cuccia maintained that the defense had been assured that all expenses would be paid by the Calcasieu Parish Public Defender’s Office. However, the defense was now informed that no funds existed for reimbursement from that source. With regard to the money for retrial, Cuccia acknowledged in the motion apparently behind-the-scenes efforts of the district judge to obtain funds, but maintained that the defense had no money to proceed. Due to this state of affairs, Cuccia moved to stay the proceedings. Exhibits to the motion were filed under seal.
 

 Hearing On Funding Issues
 

 On March 23, 2004, a hearing was held on the defense’s funding motions. In attendance before Judge Canaday were Cuc-cia and da Ponte, Reeves’ present counsel; Ware, Reeves’ originally appointed counsel; Walt Sanchez, as counsel for Ware individually; and the state. After introducing himself and his co-counsel, da Ponte, to Judge Canaday, whom they had never before met, Cuccia submitted the matter to the court on the motion and the attachments which were provided to the court under seal.
 
 [23]
 

 125Judge Canaday stated for the record that there had been a number of informal conferences between the court and counsel concerning the funding issue, and that the judge had made no secret of the fact that the court was contemplating taking “some significant action to make some changes ... ”.
 
 [24]
 
 After reviewing an affidavit from Ware regarding the financial standing of the Calcasieu Parish Public Defender’s Office and a bank statement to which the court was privy, and reviewing the caseload and structure of the local Public Defender’s Office, Judge Canaday agreed with Cuccia that “... at this time that there are not sufficient funds based on, at least, the application that was made by Defense counsel.”
 
 [25]
 

 Judge Canaday emphasized that the court had not made an independent review of the expenses submitted under seal from the first trial, nor was the court ever called upon to do so in the past, because those expenses were based on an agreement between the local Public Defender’s Office/Indigent Defender Board and the Capital Defense Project.
 
 [26]
 
 At this time, however, due to the fact that the prior expenses had not been paid and because funds for future expenses and fees would have to be obtained for the retrial, Judge Canaday stated his appreciation that the matter had now been brought before the court in order for the court to take on a management role in the case,
 
 i.e. .
 
 to view specific requests and allocation of funds that its [sic] deemed appropriate under the existing case law and Constitutional guidelines.”
 
 [27]
 

 Judge Canaday announced the court had indicated, previously and informally, that due to its fiduciary obligation to manage the retrial, the court was considering relieving Cuccia and da Ponte, who were counsel located in New Orleans, of any
 
 *1050
 
 |2(jfurther responsibility for the defense of Reeves, due to the ability of qualified local counsel to represent Reeves for the retrial. Both Cuccia and da Ponte acknowledged their familiarity with the court’s proposal.
 
 [28]
 
 For the record, Ware responded, when asked by the court, that there was no conflict whatsoever which would prevent the local Public Defender’s Office from representing Reeves.
 
 [29]
 

 Judge Canaday related his understanding that, in the prior trial, the representation by Cuccia and da Ponte was based on a contractual agreement between the parish’s Public Defender’s Office and the Capital Defense Project.
 
 [30]
 
 Based on the motions filed by these defense counsel, and their exhibits filed under seal, the court believed that the Public Defender’s Office lacked the funds to advance or to maintain the same contractual relationship the Public Defender’s Office formerly had with the Capital Defense Project, especially considering the nearness of the upcoming June trial date.
 
 [31]
 

 Before making a definitive ruling, however, Judge Canaday wished to establish a record and to obtain evidence. Upon direct questioning by the court, Cuccia agreed that he had not received enough financing from the Public Defender’s Office to be prepared for the June trial date.
 
 [32]
 
 Cuccia also explained that the Capital Defense Project was still owed more than $35,000 from the previous trial, and had received no assurances from the Public Defender’s Office that the Capital Defense Project |27WOuld receive funds in order to be ready for trial.
 
 [33]
 

 Ware told the court that the Indigent Defender Board, as of that date, maintained a balance of approximately $18,846.50 in its Capital Defense Account.
 
 [34]
 
 When the court asked Ware if Ware would be able to fund Cuccia in the same manner as Cuccia had been funded previously, to enable Cuccia to prepare for a trial currently scheduled in two and a half months, Ware responded, “No, sir, your Honor.”
 
 [35]
 
 Ware explained that, for the entirety of Cuccia’s previous representation, Ware paid invoices when they were presented by Cuccia. Ware stated that his office had, in fact, paid Cuccia a total of $85,000 to this point, as agreed. However, Cuccia had contacted Ware’s office, both in writing and orally, as described earlier, advising Ware and the Indigent Defender Board that Cuccia had an overrun of about $35,000.
 
 [36]
 

 Ware testified that he told Cuccia that the Indigent Defender Board was not in a position “then or now” either to reimburse the Capital Defense Project for the money it had already expended for Reeves’ first trial or to fund a retrial.
 
 [37]
 
 As Ware stat
 
 *1051
 
 ed: “[a]nd as it stands now, we have a serious problem with funding any capital litigation in terms of a defense in any of the cases that are pending before this Court 12^and this district.”
 
 [38]
 
 Ware assured the court that the Indigent Defender Board and Public Defender’s Office were very satisfied with the defense presented by the Capital Defense Project and would willingly reimburse Cuccia and fund a retrial if funds were available.
 
 [39]
 

 Aware of the district court’s proposed resolution of the funding dilemma, Ware objected to replacing counsel at this time due to the on-going attorney-client relationship which the Capital Defense Project attorneys had developed with Reeves. Ware acknowledged, however, “I understand all of the pitfalls and other things that are involved with this case and the other capital cases pending in this Court.”
 
 [40]
 
 He candidly admitted that he did not have “an easy or ready solution” to the problem that was before the court.
 
 [41]
 

 Both Ware and Cuccia reiterated to the court that the Capital Defense Project was not seeking attorneys’ fees for its representation of Reeves. Cuccia, on behalf of the Capital Defense Project, sought only reimbursement of expenses paid for the first trial, and included travel expenses as the only counsel expense in his estimate of retrial costs.
 
 [42]
 
 Turning to the subject of expenses, Judge Canaday observed that, without going into detail regarding the information filed under seal, he felt there had been a substantial amount of money associated with travel and associated expenses for Cuccia and his staff from Reeves’ prior defense. Cuccia agreed, responding:
 

 |2;)That’s correct, Your Honor. It took a lot of time and effort to travel back and forth from New Orleans here during the investigative stage of the case, and also to basically relocate the entire Defense team first to Baton Rouge for a week and then here for a week.
 
 [43]
 

 Based on the totality of the information before him, Judge Canaday concluded that sufficient funds were not available for a retrial to begin during the month of June of 2004, as previously set.
 
 [44]
 
 Since the financial situation necessitated that the trial date be moved anyway, Judge Canaday determined it was necessary to reassess and reevaluate the financial situation regarding counsel for the retrial. Judge Ca-naday suggested replacing existing non-local counsel with the capital-certified Ware, the local Chief Director of the Public Defender Office, and local attorney, Charles St. Dizier, as second-chair, provid
 
 *1052
 
 ed he was associate-counsel certified.
 
 [45]
 
 Before doing so, however, Judge Canaday asked to hear from Sanchez, as counsel for Ware; Cuccia and da Ponte, as existing counsel; and the prosecutor.
 
 [46]
 

 Cuccia told the court that the Capital Defense Project stood ready to continue its representation of Reeves, provided the funds they requested to present a proper defense be provided sufficiently in advance of trial, as well as reimbursement of the more than $35,000 which was advanced out of the Capital Defense Project budget for the previous trial.
 
 [47]
 
 Cuccia explained that the overage from the previous trial occurred when counsel realized they would run short of money. Rather than delay the trial, and with the assurance from Ware that money would ultimately be available |S0to reimburse him, Cuccia took upon himself the responsibility of paying those additional expenses out of his own budget rather than upset the trial date. Otherwise, Cuccia indicated he would have asked for a stay prior to the first trial, due to insufficient funds to continue.
 
 [48]
 
 Cuccia agreed with Judge Canaday that, since the Public Defender’s Office had paid the previous invoices when submitted, there had been no prior application for an
 
 in camera
 
 determination whether the expert expenses of the first trial were appropriate or reasonable.
 
 [49]
 
 Da Ponte stated that her position was the same as Cuccia’s with regard to this matter.
 
 [50]
 

 When asked his position, the prosecutor asserted the state’s view that the matter should be brought to trial as expeditiously as possible for the sake of the victim.
 
 [51]
 
 Otherwise, the state had no comment on the issue of Reeves’ counsel for the retrial.
 

 Walt Sanchez, separate counsel for Ware, objected to Ware being substituted as counsel in this ease.
 
 [52]
 
 Sanchez argued that Ware could not ethically represent Reeves due to his otherwise heavy caseload, and that the re-appointment of Ware would interfere with the attorney-client relationship which Reeves had developed with the Capital Defense Project attorneys.
 
 [53]
 
 Sanchez maintained that the case could not go forward until a definite funding source was identified and that neither Ware Imnor the Capital Defense Project attorneys could represent Reeves until that was accomplished. According to Sanchez, there would be a violation of
 
 Peart
 
 if Ware were appointed to represent Reeves, due to his burdensome caseload as the Chief Public Defender, and there would be a violation of
 
 Wigley
 
 if the court maintained the representation of the Capital
 
 *1053
 
 Defense Project’s attorneys, because private appointed attorneys would not be assured of reimbursement of their overhead and expenses.
 
 [54]
 

 After ascertaining that counsel had no further argument, Judge Canaday reiterated “... the Court is going to take much more significant action rather than to just stay the proceedings, as previously indicated.”
 
 [55]
 
 In addition to rescheduling the trial date from June 14, 2004 to October 11, 2004, and refixing motion dates in advance of the new trial date, Judge Canaday removed Cuccia and da Ponte of the Capital Defense Project as counsel for Reeves, reappointed Ware as lead trial counsel to represent Reeves for the upcoming motions and trial, and tentatively appointed St. Dizier as second-chair associate counsel to assist Ware.
 
 [56]
 
 The court explained:
 

 The Court specifically notes that it was not involved in the original appointment and it’s now become necessary to make significant decisions involved in not only the scheduling and hearing of this case but also with regard to funding matters because of situations involved with our Public Defenders’ system.
 

 Mr. Ron Ware who previously was assigned to a specific division no longer has that. He now has the ability to handle high-profile cases as well as cases of his choice and would indicate that whatever priority he assesses those cases is within his own province, noting that he has a staff of felony defenders that can take many of the cases that he has been assigned in order to proceed.
 

 Him being local the hearings can be scheduled with rather short-term necessity as need be for funding issues.
 

 132The Court finds that there will be significant savings, not only with the transportation and other living expenses of out of town counsel, but additional expenses that may be saved in the close monitoring and regulating of experts as dictated under the
 
 State v. Touchet
 
 jurisprudence for the State, and
 
 Alee versus
 
 — that’s spelled A-k-e....
 
 Oklahoma
 
 jurisprudence. Further the Court has privy of the expenditures of the first trial and would set up conference with Defense counsel to go through and discuss those funding needs for the upcoming October date at Defense counsel’s convenience.
 

 The Court has also made a decision that the Public Defenders’ Office, specifically Mr. Ron Ware, has an established relationship with the defendant, and it will be easy for him to walk in and take over these proceedings from the Capital Defense Project.
 
 [57]
 

 It is this Court’s position that if it is going to be called upon to secure and allocate the funding that’s necessary to proceed and move this case along then it will also regulate that as the law requires.
 

 The Court makes this decision in order to move the matter for trial. It is noted that this matter needs to be moved along, that the victims have requested that the matter be moved along, that the case has already been upset on one occasion for funding.
 

 
 *1054
 
 And the Court will seek and obtain the appropriate assistance if Defense counsel establishes that it is necessary so that the October date will be maintained.
 
 [58]
 

 Sanchez, on behalf of Ware, objected to the court’s ruling and gave notice of his intent to seek a writ of review.
 
 [59]
 

 Ware indicated he had two additional comments which he wanted placed on the record, and which the court could consider in the nature of a request to reconsider its ruling. First, Ware stated that none of the other nine attorneys in his office had experience with defending a person accused of a crime which carried a mandatory life sentence. Consequently, he felt compelled to be involved in the trial of every case in which his office defended someone accused of a crime which carried a mandatory [33life sentence. Second, Ware informed the judge that the time he spends on a capital case is billed against the Capital Defense Fund Account maintained by the Indigent Defender Board, which is over and above his salary as a public defender. As Ware explained, that money would go into his office’s account to fund non-capital clients.
 
 [60]
 
 Judge Canaday responded that Ware’s statement about the internal accounting operations within the public defender organization were subject to its own internal ethical considerations and auditing requirements. The court did not have a comment on that aspect put forth by Ware, “as long as it’s not an issue that’s brought before the Court.”
 
 [61]
 

 Cuccia entered an objection, on behalf of Reeves, to the court’s decision to remove him and da Ponte as Reeves’ counsel.
 
 [62]
 
 However, Cuccia did not object to the court’s ruling on his own behalf nor on the behalf of the Capital Defense Project. Similarly, da Ponte failed to object to the ruling on her own behalf or on behalf of the Capital Defense Project.
 

 Judge Canaday then informed Sanchez that he could either directly seek a writ of review from the court’s ruling as it now stood, or Sanchez could submit a brief on the constitutional issue regarding the attorney-client relationship in the form of a | .^reconsideration. If the court denied the reconsideration, then the court indicated Sanchez would be allowed time to seek review of all of the issues at once, if that was what the defense deemed appropriate.
 
 [63]
 
 Sanchez asked for a clarification of the court’s ruling, for the purpose of ascertaining exactly which issues the court had ruled on, for review purposes. Judge Ca-naday clarified that the court would re
 
 *1055
 
 main silent on the
 
 Peart
 
 aspect of the argument because, based on what had been presented, the court did not feel that any comment was required.
 
 [64]
 

 After being removed, Cuccia requested that the court consider his motion for reimbursement.
 
 [65]
 
 After some discussion between Cuccia, Ware, and the court, the matter was deferred to see what informal resolution could be accomplished at an Indigent Defender Board meeting scheduled for the next week.
 
 [66]
 
 Since the record is subsequently silent on the question of reimbursement of expenses for Cuccia and the Capital Defense Project, the court assumes that the matter was informally resolved with the parish Indigent Defender Board.
 

 Counsel of Choice
 

 In this direct appeal, Reeves argues that he was unconstitutionally denied counsel of his choice when the trial court removed Cuccia and the Capital Defense Project from representing him for the retrial and re-appointed Ware, the local Chief Public Defender. An identification of the nature of the representation of the | ^defendant provided by Cuccia and the Capital Defense Project attorneys is necessary in order to determine precisely the constitutional rights to which Reeves was entitled.
 

 Federal Constitutional Rights
 

 The Sixth Amendment to the Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” The Supreme Court has recognized the efficacy of having the assistance of counsel during the adversarial procedure of a criminal trial.
 
 Wheat v. United States,
 
 486 U.S. 153, 158-159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) (“... the Amendment secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime”),
 
 citing Gideon, v. Wainwright,
 
 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The assistance of counsel may be secured in various ways — the hiring of an attorney’s services by the criminal defendant or by another on behalf of the defendant, the attorney’s volunteering of services
 
 pro bono publico,
 
 or the court’s appointment of private counsel or the public defender if the defendant is indigent.
 

 Although “the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant ... ”, the Sixth Amendment also encompasses “... the right to select and be represented by one’s preferred attorney.”
 
 Wheat,
 
 486 U.S. at 159, 108 S.Ct. at 1697. A criminal defendant represented by an otherwise qualified attorney paid for by the defendant or paid for by someone on behalf of the defendant, or who has accepted the donation of an attorney’s services, has the right to counsel of his choice. The Supreme Court has held that “the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to
 
 *1056
 
 represent the defendant even though he is without funds.”
 
 Caplin & Drysdale, Chartered v. United States,
 
 491 U.S. 617, 36624-625, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989).
 

 However, “[t]he Sixth Amendment right to choose one’s own counsel is circumscribed in several important respects.”
 
 Id.
 
 The Supreme Court has stated unequivocally that a criminal defendant who has been appointed counsel has no right under the Sixth Amendment to the counsel of his choice:
 

 The Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts. “[A] defendant may not insist on representation by an attorney he cannot afford.”
 
 Wheat, supra,
 
 at 159, 108 S.Ct. at 1697.
 

 Caplin & Drysdale, Chartered v. United States,
 
 491 U.S. at 624, 109 S.Ct. at 2652. This distinction was again noted by the Supreme Court in
 
 United States v. Gonzalez-Lopez,
 
 548 U.S. 140, 151, 126 S.Ct. 2557, 2565, 165 L.Ed.2d 409 (2006), where the Court held “... the right to counsel of choice does not extend to defendants who require counsel to be appointed for them.”
 

 The Supreme Court has found structural error requiring reversal, and a violation of the Sixth Amendment, where a criminal defendant has been denied his right to retained counsel of choice, or where a criminal defendant has been denied the representation of counsel of choice willing to donate his services.
 
 Gonzalez-Lopez,
 
 548 U.S. at 150, 126 S.Ct. at 2564. Where the right to be assisted by counsel of one’s choice is wrongly denied, no harmless-error analysis which inquires into counsel’s effectiveness, or prejudice to the defendant, is required:
 

 Deprivation of the right is “complete” when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed.
 

 Gonzalez-Lopez,
 
 548 U.S. at 148, 126 S.Ct. at 2563.
 

 137Thus, under the Federal Constitution, a criminal defendant who has hired his own counsel, or who has counsel retained on his behalf, has a right to both effective representation and to counsel of his choice. The same is true of a criminal defendant whose counsel has volunteered his services. A criminal defendant who has been appointed counsel, whether a private attorney or a public defender, only has the right under the federal constitution to effective representation.
 

 State Constitutional Rights
 

 The Louisiana Constitution ensures similar rights to the assistance of counsel for a criminal defendant as those arising under the federal constitution. Louisiana Const. art. 1, § 13 provides in relevant part: “At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment.” As the Supreme Court has distinguished between the extent of the federal constitutional right to counsel of choice between retained or volunteered, and appointed counsel, so too has this court distinguished between the right to counsel of
 
 *1057
 
 choice when dealing with appointed counsel, and counsel retained or volunteering his or her services:
 

 As a general proposition a person accused in a criminal trial has the right to counsel of his choice.
 
 State v. Leggett,
 
 363 So.2d 434 (La.1978);
 
 State v. Mackie,
 
 352 So.2d 1297 (La.1977);
 
 State v. Anthony,
 
 347 So.2d 483 (La.1977). If a defendant is indigent he has the right to court appointed counsel.
 
 Gideon v. Wainwright,
 
 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963);
 
 Argersinger v. Hamlin,
 
 [407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972)];
 
 State v. Adams,
 
 369 So.2d 1327 (La.1979);
 
 City of Baton Rouge v. Dees,
 
 363 So.2d 530 (La.1978). An indigent defendant does not have the right to have a particular attorney appointed to represent him.
 
 State v. Rideau,
 
 278 So.2d 100 (La.1973). An indigent’s right to choose his counsel only extends so far as to allow the accused to retain the attorney of his choice, if he can manage to do so, but that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice.
 
 State v. Jones,
 
 376 So.2d 125 (La.1979);
 
 State v. Leggett, supra; State v. Mackie, supra.
 

 State v. Scott,
 
 2004-1312 p. 8 (La.1/19/06), 921 So.2d 904,
 
 cert. denied,
 
 549 U.S. 38858, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006),
 
 overruled in part on other grounds, State v. Dunn,
 
 2007-0878 (La.1/25/08), 974 So.2d 658;
 
 citing State v. Harper,
 
 381 So.2d 468, 470-471 (La.1980).
 

 Similar to the federal court, this court has determined that the right to counsel of choice extends to a criminal defendant who has hired his own counsel. In addition, the right to counsel of choice extends to a defendant who has had an attorney hired for him by a collateral source. In
 
 State v. Jones,
 
 1997-2593 (La.3/4/98), 707 So.2d 975, the defendant’s father retained an attorney to represent his son. This court held that both the federal and state constitutions precluded the removal of counsel obtained through a collateral source.
 
 Id.,
 
 1997-2593 p. 3, 707 So.2d at 977.
 

 The right to counsel of choice also extends under the state constitution to a criminal defendant for whom an attorney volunteers his legal services.
 
 State v. Sims,
 
 2007-2216 p. 1 (La.11/16/07), 968 So.2d 721, 722 (“The right to private, non-appointed counsel of choice does not distinguish between a paid attorney and a pro bono lawyer.”),
 
 citing Caplin & Drysdale,
 
 491 U.S. at 624-625, 109 S.Ct. 2646. Although the written order accompanying the writ grant in
 
 Sims
 
 does not include the facts of the case, the court record shows that a question of the indigent status of the criminal defendant was raised immediately prior to trial. Although counsel from the public defender’s office had initially been appointed to represent the defendant, immediately prior to trial, the trial judge determined the defendant did not satisfy the requirements for indigency and ordered the defendant to retain counsel. Instead, a supervising attorney at a local law school’s clinical program agreed to volunteer her representation of the defendant pro bono. When the defendant appeared in court with volunteer counsel, the trial court removed volunteer counsel, ordered the defendant to hire a private, paid lawyer, and forbade the defendant from being represented by any attorney working
 
 pro bono.
 
 | :i9The court of appeal denied a writ of review. This court issued a written order, granting the defendant’s writ. This court ruled that the trial court erred in removing the defendant’s volunteer counsel of choice, reversed the trial court’s order removing volunteer counsel and reinstated volunteer counsel’s representation
 
 *1058
 
 of the defendant.
 
 Sims,
 
 2007-2216 p. 1, 968 So.2d at 722.
 

 However, similar to the constitutional rights afforded under the federal constitution, under our state constitution, a criminal defendant is not entitled to choose his appointed private counsel or the appointed public defender.
 

 Analysis
 

 Reeves asserts on appeal that he was denied the right to counsel of his choice, that denial of this right is a structural error in his retrial, and that the re-appointment of Ware as his counsel for the retrial entitles Reeves to a reversal of his conviction and sentence, and a new trial. The defense asserts that Cuccia and da Ponte, through the Capital Defense Project, were willing to continue to represent Reeves at his retrial at no cost to the state. Considering the right to counsel of choice under federal and state law extends only to retained or volunteered counsel, the defense does not specify whether Cuccia and da Ponte were somehow retained or whether they were donating them services.
 

 By contrast, the state argues that the nature of Reeves’ initial representation by Cuccia and da Ponte through the Capital Defense Project was that of appointed counsel. Thus, the state argues, under either the federal or state constitutions, Reeves does not have the right to appointed counsel of choice. The state contends that the financial realities of the indigent defense system, and the conditions Cuccia himself placed on the continuance of his group’s representation, led to the removal of Cuccia and da Ponte. In their place, the state asserts the court, in its discretion, appointed Incompetent and qualified counsel in the person of Ware, the capital-certified local Chief Public Defender.
 

 In order to fully comprehend the nature of the representation provided by Cuccia and da Ponte, it is necessary to understand certain aspects of the former structure of the indigent defense system in Louisiana, prior to the passage of the Louisiana Public Defender Act of 2007. Former La. R.S. 15:144 established an indigent defender board in each judicial district.
 
 [67]
 
 In order to provide counsel for indigent defendants in its judicial district, the Calcasieu Parish Indigent Defender Board selected the model of employing a chief indigent defender and such assistants and supporting personnel as the district board deemed necessary.
 
 [68]
 
 Additionally, the legislature authorized the district boards to enter into contracts with other attorneys to provide counsel for indigent defendants when necessary.
 
 [69]
 

 
 *1059
 
 Each district indigent defender board was authorized to accept, receive and use |41public or private grants.
 
 [70]
 
 The primary source of funding for the district boards, however, was the indigent defender fund created within each judicial district, which the district boards administered, and which was additionally composed of funds obtained through legislatively-authorized fees and direct state contributions.
 
 [71]
 

 Another former feature of the indigent defense system was the legislature’s establishment of a state-wide entity, the Louisiana Indigent Defense Assistance Board in the office of the governor, known by its acronym “LIDAB.”
 
 [72]
 
 The purpose of LI-DAB was to provide supplemental funds, when appropriated by the legislature, to | ,l2district indigent defender boards to address specific criminal defense needs.
 
 [73]
 
 One of the specific criminal defense needs to be addressed by LIDAB was the adoption of rules for supplemental assistance for trial counsel in capital cases where the local indigent defender board was unable to provide counsel.
 
 [74]
 
 LIDAB was author
 
 *1060
 
 ized by the legislature to develop and maintain - programs to implement the guidelines for this type of supplemental assistance.
 
 [75]
 

 The Capital Defense Project was a part of the regional capital defense program created and funded by LIDAB. As explained by defense counsel in its brief on appeal: “... Mr. Cuccia’s initial involvement in the case was based through an independent capital trial office relying on staff attorneys created through Louisiana Indigent Defense Assistance Board’s regional capital defense program, and not Liithrough the selection by the district court.”
 
 [76]
 
 The record contains a discussion which explains the relationship even more explicitly. During a hearing on several defense motions held on September 16, 2003, prior to the first trial, Judge Quienalty, the then-presiding judge, specifically questioned Cuccia as to whether he had been hired or appointed. Cuccia responded:
 

 Cuccia: We are an indigent counsel. We are a private non-profit organization funded by the Louisiana Indigent Defender Assistance [Bjoard to primarily provide representation to indigents when there is a conflict of interest between the regular Public Defender’s Office and the defendant. In this particular case, I am here with a — and usually that’s because there are two or more defendants — in this case, I am here with Jason Reeves because the Calcasieu Parish Public Defender’s Office needed help and—
 

 Court: So, they hired you?
 

 Cuccia: They provided the funds for all of the investigations.
 

 Court: Okay.
 

 Cuccia: I have not — I personally have not received one penny. My program has not received—
 

 Court: I’m just trying to figure out how you got into this.
 

 Cuccia: I just want to make sure when you say hired.
 

 Court: Okay.
 

 Cuccia: We’re over here representing an indigent. Calcasieu Parish Public Defender’s Office has funded the defense of this case.
 

 Court: Well, did some judge appoint you?
 

 Cuccia: Certainly Judge Minaldi [who had previously presided over the case] accepted me — She did not—
 

 Court: No, it’s a very simple question. Did some judge appoint you or did you enroll at the request of our Indigent Board?
 

 Cuccia: I volunteered at the request of the—
 

 l44Court: Okay.
 

 
 *1061
 
 Cuccia: —Indigent Board with the approval of Judge Minaldi.
 

 Court: Very well.
 

 Cuccia: I don’t know if she made a formal appointment or not.
 
 [77]
 

 Cuccia maintains, and the record reflects, that the local indigent defender board funded the investigation of the case as far as it was able. Cuccia agreed to the representation, on behalf of the Capital Defense Project, at the request of the local indigent defender board. Cuccia did not receive attorneys fees from the local indigent defender board; however, the Capital Defense Project was funded, for the time period at issue, in large part, if not wholly, by the state through LIDAB and the Governor’s Office.
 

 According to Ware, the Capital Defense Project began representing Reeves on March 28, 2002. The funding hearing at which Cuccia and da Ponte were removed was held on March 23, 2004. This court takes judicial notice that, for the three year time period from July 1, 2001 through June 30, 2004, which includes the two year time period of the Capital Defense Project’s involvement in Reeves’ case, the Capital Defense Project of Southeast Louisiana received contracts for legal services from the Governor’s office through LIDAB in the amounts of $675,000 (for Fiscal Year 07/01/01-06/30/02) and $425,000 (for Fiscal Year 07/01/03-06/30/04), for a total of $1.1 million. La. C.E. 201;
 
 see
 
 2001/2002 Office of the Governor, Division of Administration, Office of Contractual Review Ann. Rep., “Professional, Personal, Consulting, and Social Services Contracts-Top 50 Legal Contractors 07/01/01-6/30/02;”
 
 and
 
 2003/2004 Office of the Governor, Division of Administration, Office |4Sof Contractual Review Ann. Rep., “Professional, Personal, Consulting, and Social Services Contracts-Top 50 Legal Contractors 07/01/03-06/30/04.” Post-2007 reform, the Capital Defense Project is now listed as a state-funded, regional capital conflict panel on the Louisiana Public Defender Board’s website. Consequently, although not a part of the local Public Defender’s Office, the Capital Defense Project, funded through LIDAB, was another arm of the indigent defense system funded by the state.
 
 [78]
 

 With these relationships in mind, the nature of Reeves’ representation by Cuccia and da Ponte becomes clear. Reeves was initially determined to be indigent and the local public defender’s office was appointed as his counsel. The local district indigent defender board contracted with the Capital Defense Project, as part of LIDAB’s regional capital defense program, for capital trial assistance with this case.
 
 [79]
 
 Stated another way, the state-wide supplemental assistance aspect of the state indigent defense system assisted the local arm of the state indigent defense system, which had been appointed as counsel for Reeves. Consequently, we find that the representation by the Capital Defense Pro
 
 *1062
 
 ject in this case was characteristic of appointed counsel.
 

 This case is distinguishable from cases where a criminal defendant retains counsel himself or finds a collateral source willing to shoulder his representation, either through payment or a donation of services. Although the original contract between the district Indigent Defender Board and the Capital Defense Project included an amount for attorneys’ fees, those attorneys’ fees, if paid, would have been paid by legislatively-approved fees or direct state financing by the local district |4(iIndigent Defender Board. As it occurred, attorneys’ fees were not paid through the contract, but the attorneys who represented Reeves were funded through a state-financed contract under a LIDAB program. Indeed, at the funding hearing, Ware explained the $50,000 figure for attorney fees in the original contract, as follows: “[t]hat would represent the actual attorney fees, that Mr. Cuccia and his staff would not enjoy personally but would go to his office as compensation for the time that they spent representing Jason.”
 
 [80]
 
 Cuccia further explained that the additional $35,000 “was advanced out of the Capital Defense Project budget.”
 
 [81]
 

 Although defense counsel on appeal sometimes characterizes the Capital Defense Project’s representation as a
 
 pro bono
 
 donation of services, trial defense counsel considered the nature of the representation to be that of appointed counsel. Cuccia told Judge Canaday:
 

 ... Although, I would point out that maybe this is — maybe we’re in this case in somewhat of an odd circumstance because we did, I guess, contract with the IDB to provide this representation.
 

 But it was only with the approval of Judge Minaldi, and specific understanding — so, I always felt that there was a — to a great extent, a court appointment.
 

 I mean, a Court was — we would not have been led — Judge Minaldi wanted to pass on — -pass approval on it before we actually got in this case, and the arrangements that were made with the Public Defenders’ Office.
 
 [82]
 

 Sanchez, representing Ware, was correct in stating that Cuccia was a private lawyer, or at least was an attorney outside of the local public defender’s staff.
 
 [83]
 
 |47However, Cuccia was a private lawyer who was working pursuant to a contract with the local Indigent Defender Board and who was otherwise funded by the state. Under the unique and exceptional circumstances of the interplay between the local and regional indigent defense system, the nature of Reeves’ representation by Cuccia and da Ponte was characteristic of appointed counsel. As such, Reeves did not have a right to counsel of choice under either the federal or state constitutions, but only had the right to effective representation of counsel.
 

 Having made the determination that Reeves was not constitutionally entitled to counsel of his choice, we feel we must nevertheless address whether the trial judge’s removal of Cuccia and the Capital Defense Project staff, and the reap
 
 *1063
 
 pointment of Ware as counsel for Reeves, was proper. This court has previously held that the removal of counsel must be reviewed for an abuse of the trial court’s great discretion.
 
 See State v. Brown,
 
 2003-0897 p. 15 (La.4/12/05), 907 So.2d 1, 14,
 
 cert. denied,
 
 547 U.S. 1022, 126 S.Ct. 1569, 164 L.Ed.2d 305 (2006).
 

 We note, primarily, the difficulty of the problem facing the district court. Cuccia’s motions indicated that expenses were still owed on the first trial, and more funding, for which no source was apparent, was immediately necessary for the retrial. Indeed, Cuccia himself qualified his continued representation of the defendant when he stated:
 

 Your Honor, our position is that we stand ready to continue with the representation of Jason
 
 Reeves, provided
 
 that we can — that the funds that we need to present the proper defense for him can provide — can be provided to us sufficiently in advance of trial for us to prepare and present the type of defense that Jason Reeves is entitled to, as well as, of course, we would like the reimbursement of the $35,000 which I — which was advanced out of the Capital Defense Project budget.
 
 [84]
 

 Cuccia made clear in his representations to the court that he could not continue to | ^represent Reeves unless the financial circumstances changed and was requesting the district court’s direction and intervention in resolving the matter.
 
 [85]
 

 The record shows that all counsel participated with the district judge in discussions seeking a solution.
 
 [86]
 
 The record makes apparent that the district court’s proposed solution of removing Cuccia and da Ponte and substituting Ware as appointed counsel was not a surprise to either then-current or proposed counsel. Indeed, Ware brought to the funding hearing separate counsel to represent him in his, capacity as chief public defender of the district to argue against his expected substitution and reappointment. After Judge Canaday issued his ruling, neither Cuccia nor da Ponte objected to the ruling on behalf of themselves or the Capital Defense Project. Objections were lodged by Cuccia on behalf of the defendant,
 
 [87]
 
 and by
 
 *1064
 
 Ware;
 
 [88]
 
 however, Ware’s counsel made clear during argument that he would have |43objected to any decision of the court which resulted in Ware’s appointment. Indeed, counsel for Ware made clear he would have supported the appointment of anyone other than Ware.
 
 [89]
 

 Although
 
 Citizen
 
 gave district courts the authority to halt a prosecution until adequate funding was secured,
 
 Citizen
 
 had not yet been handed down at the time of this funding hearing. We take into consideration the fact that Reeves’ initial trial had fully concluded, and the retrial was to be re-set several months into the future in any event, due to the lack of immediately-available funding. This was not a situation where counsel was substituted on the eve of trial without sufficient time to fully prepare. The district court foresaw that reappointed counsel would have adequate time to prepare a defense, especially considering that the state’s entire case, with a few evidentiary exceptions, was available
 
 via
 
 the transcripts of the first trial.
 
 [90]
 

 Moreover, the district court anticipated the appointment of qualified local counsel would facilitate prompt resolution of future funding, and other questions, that would arise in connection with the retrial. The record bears out this consideration. The district court, and everyone involved in these discussions, were well aware of the seemingly insoluble funding issues which plagued this judicial district at that time. Appointing local counsel allowed the district court to quickly set hearings for Isoquestions that arose pretrial.
 
 [91]
 
 In a status conference held on May 21, 2004, the district court indicated that every week that criminal court was to be held, the court would hold a status hearing on the
 
 Reeves
 
 case to address any impediments in a timely fashion and to resolve them.
 
 [92]
 
 In a September 15, 2004 motion hearing, the court pledged to make himself available on a “short time basis” to make certain that all defense issues were dealt with and addressed pretrial.
 
 [93]
 

 In arguing that the desire to appoint local counsel is not a sufficient factor to overcome an attorney-client relationship, defense counsel on appeal directs us to the case of
 
 Grant v. State,
 
 278 Ga. 817, 607 S.E.2d 586 (Ga.2005), a Georgia death penalty prosecution. In
 
 Grant,
 
 the trial court tried to impose appointed co-counsel to assist already-appointed lead counsel and to forbid volunteer attorneys from working on the case. Relying on earlier state court jurisprudence, the Supreme Court of Geor
 
 *1065
 
 gia held that the trial court failed to give proper weight to the significant relationship that existed between Grant and his lead appointed counsel and the volunteer attorneys who worked with him.
 
 Grant,
 
 607 S.E.2d at 587.
 

 We note, however, that the
 
 (Grant
 
 case is easily distinguishable from the facts of this case. The counsel at issue in
 
 (Grant
 
 were volunteering their services; thus, Grant had a federal constitutional right to counsel of his choice. Moreover, in this case we find that the desire to ensure the participation of local counsel was not the motivating factor behind Judge Canaday’s ruling; rather, non-local defense counsel informed the court of them inability to proceed without a solution to the funding issue, seeking the court’s intervention and direction.
 

 We have held that counsel was appointed for Reeves. Consequently, Reeves | S1 did not have the right, under either the federal or state constitutions, to counsel of his choice. We hold that the district court’s actions, in removing Cuccia and da Ponte and reinstating the appointment of Ware as counsel for Reeves, did not result in structural error in Reeves’ retrial. We further find that, considering the unique and exceptional circumstances presented here, the district court did not abuse its discretion in removing Cuccia and da Ponte from representing the defendant, upon being informed that they could no longer continue their representation under then-existing conditions. We additionally find no abuse of the district court’s discretion in reinstating the original appointment of the local, capital-certified Chief Public Defender as counsel for Reeves for his retrial.
 

 Attorney-Client Relationship
 

 In connection with the defendant’s claim of a right to counsel of choice, defense counsel argues on appeal that the existing close relationship between Reeves and the attorneys of the Capital Defense Project should have been maintained. This issue was briefly raised at the funding hearing, with Ware’s counsel, and Ware himself, arguing that there was a constitutional dimension to preserving an existing attorney-client relationship. However, no specific constitutional argument was made, either at the hearing, or later in a supplemental filing to the district court, despite the district court’s invitation to do so.
 
 [94]
 
 After a review of the jurisprudence, we find no constitutional authority to support this aspect of the defense’s argument, either in the federal or state constitutions.
 

 The Supreme Court has rejected any claim that the Sixth Amendment |fi2guarantees a “meaningful attorney-client relationship” between an accused and his counsel.
 
 See Morris v. Slappy,
 
 461 U.S. 1, 14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983). The fact situation in
 
 Morris
 
 concerned an indigent defendant who was appointed an attorney from the public defender’s office. Appointed counsel represented the defendant at preliminary hearings and supervised an extensive investigation into the case. However, shortly prior to trial, appointed counsel was hospitalized for emergency surgery and the public defender assigned a senior trial attorney in that office to take over
 
 *1066
 
 the defendant’s representation. The defendant objected at trial to his newly-appointed counsel, arguing that substitute counsel could not be as prepared as his original counsel, and refusing to aid substitute counsel in his defense. The defendant was convicted and subsequently sought federal habeas relief. Although the
 
 pro se
 
 federal habeas petition couched the alleged errors in other terms, the federal appellate court granted habeas relief, finding the Sixth Amendment guarantees a right to counsel with whom the accused has a “meaningful attorney-client relationship.” Further, the federal appellate court found that the trial court abused its discretion and violated this right by denying a motion for continuance based on the substitution of appointed counsel shortly before trial. In reversing the federal appeals court ruling, the Supreme Court stated:
 

 The Court of Appeals’ conclusion that the Sixth Amendment right to counsel “would be without substance if it did not include the right to a
 
 meaningful attorney-client relationship,
 
 [citation omitted] (emphasis added), is without basis in the law. No authority was cited for this novel ingredient of the Sixth Amendment guarantee of counsel, and of course none could be.”
 
 [95]
 

 Similarly, we have found nothing in our state constitution, or in our review of state jurisprudence, which shows that a criminal defendant has a right to a particular attorney-client relationship separate from the right to counsel of choice. In
 
 Scott, \wsupra,
 
 the defendant argued, as here, that the removal of his appointed counsel approximately one month prior to trial unconstitutionally interfered with the attorney-client relationship and violated his right to counsel of choice.
 
 [96]
 
 In
 
 Scott,
 
 a conflict developed between Scott’s lead appointed counsel and second-chair appointed counsel. The district court granted lead counsel’s motion and appointed new second-chair counsel over the defendant’s objection. After reviewing the consistent jurisprudence holding that an indigent defendant does not have the right to choose his appointed counsel, and that lead appointed counsel had provided constitutionally-effective assistance to Scott, this court found “no interference with the attorney-client relationship and no violation of defendant’s right to counsel of choice.”
 
 [97]
 
 Here, we similarly find that Reeves did not have a right to choose his appointed counsel. Moreover, there is nothing in our state constitution which supports the defense’s argument that a criminal defendant has a right to a particular attorney-client relationship.
 
 [98]
 

 Consequently, there is nothing in either the federal or state constitutions which would provide Reeves with the right to maintain a particular attorney-client relationship in the absence of a right to counsel of choice.
 

 
 *1067
 

 Right to Auxiliary Services
 

 In a related argument, defense counsel contends that Reeves was entitled to retain counsel of choice while securing auxiliary services from the state, citing to
 
 54.State v. Jones,
 
 1997-2593 (La.3/4/98), 707 So.2d 975. Defense counsel’s primary contention in this regard is that the district court’s action, in removing Cuccia and da Ponte as counsel, and re-appointing and substituting Ware in response to Cuccia’s motions for reimbursement and future funding, was neither requested nor warranted, and that less drastic options were available.
 

 As stated previously, in
 
 Jones,
 
 the defendant’s father retained counsel for his son. Although the criminal defendant did not retain counsel himself, counsel was provided to him by a collateral source; counsel was not appointed.
 
 Jones
 
 held that a defendant provided private counsel, through a collateral source, has a constitutional right to counsel of choice. In addition, the case stands for the proposition that retention of private counsel from a collateral source, at no cost to the defendant, does not remove the defendant’s right to a fair trial. Thus, notwithstanding the fact that the criminal defendant has no need for appointed counsel, the defendant may still be entitled to state funding for auxiliary services, such as experts.
 
 Jones,
 
 1997-2593 p. 4, 707 So.2d at 977. We find no violation of the precepts set forth in
 
 Jones
 
 in our review of the record of this case.
 

 Reeves’ entitlement to funding for experts was never in doubt. Reeves was declared indigent and the public defender’s office was appointed to represent him. Thereafter, the public defender’s office, through the district indigent defender board, contracted with a capital trial program in connection with LIDAB for Reeves’ initial trial counsel. For his retrial, Reeves was represented by the local Public Defender’s Office. Thus, there is no question that Reeves was entitled to state funding for expert assistance.
 

 Moreover, the record confirms that expert assistance was afforded to him at both his first and second trials. Several motions for funding were considered in
 
 ex
 
 [
 
 aparte
 
 hearings and granted prior to Reeves’ second trial.
 
 [99]
 
 Some of those motions involved reimbursement of experts who testified in the first trial.
 
 [100]
 
 In some cases, the expert witnesses were to be used in both trials and Judge Canaday found “[the outstanding balances were] interfering, not only with communications possibly with regard to using those experts again at a second trial, but also with Mr. Cuccia and Ms. da Ponte, as well as any other use of those experts in Louisiana defense cases.” Judge Canady noted “... that many of the tests, many of the interviews, many of the expenses, will not have to be duplicated, but that there will be some additional refreshings, some reviewing of the materials, and also the appearance at [rejtrial itself.”
 
 [101]
 
 Ware ex
 
 *1068
 
 pressed his “complete agreement with those comments.”
 
 [102]
 
 The record clearly shows that Reeves was provided with expert assistance in defending himself against the charge of first degree murder and that Reeves’ right to expert assistance has never been denied.
 

 Further, we find the district court did not inject himself arbitrarily into this funding morass. This complicated and confusing situation was brought to the court’s attention through defense trial counsel’s motions for reimbursement and for future expenses; trial counsel properly solicited the court’s aid in resolving these issues. Although defense counsel on appeal suggests the district court should have halted the prosecution going forward until adequate funds were available, as authorized by this hfiCourt in
 
 Citizen,
 
 we note that
 
 Citizen
 
 had not yet been handed down at the time of this funding hearing. Even so, the record shows the district court was assured by Ware that additional funding was not available and would not be available in any foreseeable future.
 

 The defense argued in brief, and at oral argument in this court, that the removal of Cuccia and da Ponte did not actually save the state money, since the state had to pay for St. Dizier’s appointment.
 
 [103]
 
 However, the subject of the funding of St. Dizier’s appointment was not raised in the district court by the defense. In fact, Ware testified at an
 
 ex parte
 
 status conference held June 22, 2004, that the IDB had sufficient funds through its Capital Defense Fund to pay St. Dizier’s fee “into the next several months.”
 
 [104]
 
 At a subsequent hearing, Ware explained that the Capital Defense Fund “replenishes itself each month with the monthly receipts of court cost revenue.”
 
 [105]
 
 The court noted that “... the Capital Defense Fund is an ongoing account for which deposits are made on a monthly basis....”
 
 [106]
 
 For reasons not apparent from the record, Ware had not thought sufficient funds would have been available for the reimbursement of Cuc-cia.
 
 [107]
 

 We note the district court fully discussed his proposed action with all counsel prior to the hearing in an attempt to reach a proper solution. There were many competing interests for the district court to consider. Paramount, of course, were the | ¡^defendant’s rights to a fair trial and effective counsel. The public defender’s office had no solution to offer the district court, other than to suggest that someone else be appointed or that the trial be halted. Without doubt, Cuccia and da Ponte were owed reimbursement of their expenses. Future funding was, considering the lack of resources for indigent defense, necessarily, going to be an issue for the district court to address in an on-going manner, and ease of scheduling hearings to deal with the anticipated funding motions
 
 *1069
 
 was an additional factor which the district court took into consideration. In addition, the district court also had to consider the rights of the victim’s family in having this case prosecuted in a timely fashion, as well as the time limitations imposed by the Code of Criminal Procedure for bringing indicted defendants to trial.
 
 [108]
 

 Moreover,
 
 Citizen
 
 does not stand for the proposition that ordering a halt to a trial is the only authorized remedy for a district court when adequate funds are not available to provide for an indigent defendant’s constitutionally-protected right to counsel. Indeed,
 
 Citizen
 
 authorizes courts to “take other measures consistent with this opinion which protect the constitutional or statutory rights of the defendants.”
 
 Id.,
 
 2004-1841 p. 17, 898 So.2d at 339.
 

 Reeves was constitutionally entitled to effective counsel and a fair trial. In the circumstances presented here, we find that the solution fashioned by the district court accomplished both constitutional requirements. Reeves was appointed able and effective lead counsel in the person of the local, capital-certified, chief public defender, and able and effective associate counsel in the person of an experienced local attorney. Moreover, a third attorney who worked with the Public Defender’s | sjjOffice, was also enrolled as counsel for Reeves and participated in Reeves’ retrial. Adequate funding was subsequently found to enable Reeves to present his defense at his retrial with expert assistance. Although the district court could have chosen a different solution from the universe of possible alternatives, we hold the measures taken by the district court here adequately protected the defendant’s constitutional rights to effective appointed counsel and a fair trial.
 

 Denial of Peart Motion
 

 The defense contends the district court erred in re-appointing Ware at the March 23, 2004 funding hearing over his oral
 
 Peart
 
 objection, and in denying Ware’s subsequent written
 
 Peart
 
 motions, based on his heavy caseload. Reeves argues he received constitutionally ineffective assistance of counsel due to Ware’s heavy work load.
 

 Facts Relevant To Peart Issue
 

 Although the focus of the March 23, 2004 hearing was primarily the funding issue raised by defense counsel, part of the argument raised by separate counsel for Ware in support of the position that Ware should not be re-appointed to this case was that Ware’s heavy caseload and administrative responsibilities would prevent him from rendering constitutionally-effective assistance of counsel. In support of this
 
 Peart
 
 argument, Ware’s attorney, Walt Sanchez, proposed a stipulation as to Ware’s personal pending caseload, the number of cases in which Ware would participate with other attorneys who had primary responsibility, and the administrative and supervisory duties for which Ware was responsible as Chief Public Defender. Sanchez also referred to the Rules of Professional Conduct and an ethics opinion.
 

 At the hearing, Sanchez acknowledged that, “... given the timing of this issue, |S9[the
 
 Peart
 
 issue] isn’t full blown in front of the Court at this point.”
 
 [109]
 
 After Judge Canaday ruled and substituted counsel, Sanchez specifically asked the judge if he would formally rule on the
 
 Peart
 
 issue
 
 *1070
 
 which had been raised. The judge stated that he did not believe any comment was required on the
 
 Peart
 
 issue, based on what had been presented, and later clarified that a reconsideration of that view would only be based on “something much more substantial in black letter law.”
 
 [110]
 
 At a subsequent hearing held September 15, 2004, Ware admitted that the March 23, 2004 hearing “was not a
 
 Peart
 
 issue, it was a substitution of counsel issue, so there were some references made to the
 
 Peart
 
 case and things of that sort, but it wasn’t fully developed.”
 
 [111]
 

 Defense counsel raised the
 
 Peart
 
 issue in subsequent motions, hearings, and status conferences. On April 13, 2004, Ware filed a motion seeking the court’s reconsideration of its March 23, 2004 order substituting counsel.
 
 [112]
 
 In addition to asking the court to reconsider its removal of Cuccia, da Ponte and Taylor as trial counsel, Ware also requested reconsideration of the portion of the court’s ruling which re-appointed him as counsel, suggesting “... that current counsel will be unable to provide reasonably effective representation because of undersigned counsel’s obligations to numerous other clients and his administrative duties as Executive Director of the Public Defenders’ Office.”
 
 [113]
 
 The district court denied the defendant’s motion.
 
 [114]
 

 | ^Subsequently, a status conference was held on May 21, 2004.
 
 [115]
 
 At that time, Ware informed the court of his upcoming schedule as part of his continuing objection to his appointment as lead counsel to the case.
 
 [116]
 
 The district court noted that Ware made these same arguments and objections at the time of his re-appointment. The court also noted that the defense had failed to take a writ on Ware’s re-appointment, and stated its belief that the defense had evidently made the strategic decision to reserve that issue for appeal. Ware did not dispute this belief.
 
 [117]
 

 Another status conference was held on June 18, 2004.
 
 [118]
 
 Ware discussed with the court that the defense would be filing a motion to enroll an additional attorney from the public defender’s office to assist with the defense of the case.
 
 [119]
 
 On June 23, 2004, a written motion to enroll Richard White, a staff attorney with the Calca-sieu Parish Public Defenders’ Office, was granted.
 
 [120]
 

 Also on June 23, 2004, the defense filed a written
 
 Peart
 
 motion, asserting that Ware “has primary trial responsibility for 35 felony cases (including 1 capital rape, 5 second degree murder cases, and 10 aggravated rape cases). He is also playing a significant role in many other felony cases, that are being handled to some extent by other PDO attorneys.”
 
 [121]
 
 The defense also sought to enroll separate counsel, Christine Lehmann, for the purpose of arguing the
 
 Peart
 
 motion.
 
 [122]
 

 
 *1071
 
 .J^The district court denied the motion to enroll Lehmann as separate counsel for the
 
 Peart
 
 hearing, and declined to hear the
 
 Peart
 
 motion itself:
 

 The Court would take notice at this time that nothing was stated in the body of this motion that was not argued or presented in court previously when new counsel was to be appointed. At that time the defendant was independently represented by Mr. Kerry Cuccia and Graham Deponte [sic]. In addition, Mr. Ron Ware and the Public Defenders’ Office was independently represented by Mr. Walt Sanchez. The record speaks for itself as to the information that was presented to the Court prior to Mr. Ware and Mr. St. Dizier being appointed as counsel. It talked about caseload, it talked about a number of factors in which the Court made rulings and findings of which the Court would rely on the record at this time. Writs were not taken with regard to the Court’s decision. The Court finds that this Motion to Enroll and the request for
 
 Peart
 
 information to be duplicative and moot based on the prior proceedings and determination of this Court and I will decline the appointment and I will also decline to fix a
 
 Peart
 
 proceeding in this matter.
 
 [123]
 

 Upon Ware’s request for clarification regarding the judge’s refusal to fix the
 
 Peart
 
 motion for hearing, the judge stated:
 

 Correct, until something can be demonstrated to the court in writing that would be distinguishable from what was presented at the time of appointment, I believe that was in April [sic; March] of 2004, that was distinguishable and for good cause why it was not presented there’s no reason for the Court to rehash the same matters that have been discussed.
 
 [124]
 

 Ware then explained that he was re-urging his
 
 Peart
 
 objection because, as he became more familiar with the case, he felt it was even more apparent that he could not be effective.
 
 [125]
 
 The judge stated he understood, but rejected, Ware’s position, indicating anything that Ware was now saying had been said previously:
 

 I see no reason to go back unless some new information has been obtained and that new information can be specifically given to the Court | )i2to review — reopening an issue that you’re concerned about and that there’s good cause for not having that information previously. Those are the standards in order to review something that the Court feels has already been reviewed.
 
 [126]
 

 In addition to the comments made by the court as to the merits of the
 
 Peart
 
 motion, the court noted the motion to enroll and the
 
 Peart
 
 motion were denied as having been submitted under Ms. Lehmann’s signature, who was not counsel of record, but were to be made part of the proceedings as a proffer.
 
 [127]
 

 
 *1072
 
 On June 29, 2004, the defense filed a notice of its intent to seek a writ from the district court’s refusal to hear the
 
 Peart
 
 motion and a writ application was subsequently filed in the court of appeal.
 
 [128]
 
 The court of appeal, in a 2-1 ruling, denied the defense’s writ, stating:
 

 There is no error in the trial court’s ruling which denied the motion to enroll additional counsel for the limited purpose of litigating a
 
 Peart
 
 motion. Based thereon, we additionally find that the trial court did not err in refusing to allow the
 
 Peart
 
 motion to be filed because it was not signed by enrolled counsel.
 
 [129]
 

 On September 3, 2004, the defense tried again, and filed another
 
 Peart
 
 motion.
 
 [130]
 
 The allegations in this motion added the information that “... despite his diligent efforts, [Ware] continues to be unable, due to his other caseload and his administrative duties, to provide fully competent and adequate representation to Mr. Reeves.” The motion alleged generally that “[Ware’s] personal caseload continues | fi3to be of a volume that is out of compliance with LIDAB and ABA standards for competent capital representation.” Included as an exhibit was a “Declaration of Jason Reeves,” requesting that Cuccia and da Ponte be placed back on the case.
 
 [131]
 

 The state opposed the defense’s
 
 Peart
 
 motion as being repetitive, pointing out that the new
 
 Peart
 
 motion was nearly identical to several previous motions filed by the defendant and ruled upon by both the district court and the court of appeal. The sole “new” issue presented in the latest motion urged the court to reinstate Reeves’ former counsel for the retrial, a little over a month before Reeves’ second trial was to begin, and over seven months since Ware was assigned to the case. The state urged that this latest filing was clearly a dilatory tactic, as all issues had thoroughly been fleshed out and discussed in previous motions. Further, the state noted that the defense had never sought further review from the Louisiana Supreme Court.
 
 [132]
 

 At a hearing on the defense’s second written
 
 Peart
 
 motion, held September 15, 2004, the district judge stated his appreciation of the history of the defense’s
 
 Peart
 
 allegations, beginning with the March 23, 2004 hearing:
 

 In that March of 2004 proceeding the Court I believe accepted Mr. Walt Sanchez, who appeared and made an appearance as counsel for Mr. Ron Ware. It’s also noticed that Mr. Cuccia and Ms. DaPonte were present and were independent counsel for Mr. Reeves during those proceedings. In addition, the defendant was present; and, in addition, the State was present. And the Court received substantial information and argument with regard to Mr. Ware’s caseload, his administrative duties, his supervisory duties, everything that is contained within the concerns espoused in the
 
 Peart
 
 motion.
 
 [133]
 

 
 *1073
 
 Judge Canaday noted that a formal, written
 
 Peart
 
 motion was submitted by the defense in June of 2004, but that he denied the motion itself based on the fact that the motion was not submitted by an attorney of record in the case. The judge noted that |Mwrits were taken from this ruling, and denied by the court of appeal.
 
 [134]
 
 Judge Canaday continued, as follows:
 

 ... on September of 2004 now the defendant has as lead counsel resubmits [sic] under his signature the same proceedings disposed of in the June 2004 and March 2004 proceedings. As stated before, the Court has taken the concerns of counsel into consideration, specifically initially at the March of 2004 reassignment proceedings and determined that the unique position of Mr. Ware would only be self-limiting. It was noted at that time Mr. Ware did not have any division assignments. He is the only capital certified public defender within Calcasieu Parish Public Defenders’ office as lead counsel. He has handled other capital matters, and the other capital matters that were pending within Calcasieu Parish have been staggered to allow preparation within time constraints to Mr. Ware. Further, he has been able to pick and choose the cases he wishes to become personally involved in. It is noted that there are other felony public defenders who are assigned to specific divisions that have primary responsibility for those cases, and Mr. Ware makes those decisions on his own as to whether he wants to be involved, should appear, and supervise. The Court also notes the years of experience he has had in administrating and oversight of the Calcasieu Parish Public Defenders’ Office. Further and even additionally important is the previous representation of other felony charges to this specific defendant, Mr. Jason Reeves, and the rapport and relationship that is noted by the Court in the February of 2004 trial.
 

 Now, in totality and in looking at the standards as indicated of the facts specific, the Court would have to make this comment, that in the past six months since the reappointment the Defense team, which are three capable attorneys at this point, have effectively represented the defendant through all new areas. Motions have been filed, there’s been aggressive cross-examinations, and there’s been significant tidal preparation both open and adversarially as well as ex parte with relations to the Court of which the record will speak for itself. The Court is clearly satisfied that there has been effective representation up to this point exceeding all
 
 Strickland v. Washington,
 
 466 U.S. 668 [104 S.Ct. 2052] standards. I would like to note just for your concern that in this day and age it seems to be that there must be many motions and actions that are taken in order to defend all of those charged with crimes, but it is also necessary that individuals file certain motions to protect those that are even appointed to represent those defendants, and the Court acknowledges that and understands the need for those motions to be filed, Mr. Ware.
 

 The Court will at this time as to the application of the
 
 Peart
 
 proceeding is going to deny the — will allow you to file the motion, but will deny the fixing of the motion. It is being denied as repetitious. It | (¾⅛ also noted as res judicata and the law of the case doctrine. Nothing has changed; and, in fact, the actions of Defense counsel in the interim while these arguments and positions
 
 *1074
 
 have been presented have demonstrated just the opposite [sic; “,”] of thoroughly effective preparation. Any specifics, statistical data, that you feel the Court has not had or received will be allowed to be proffered into the record. That may be submitted since the motion is part of the record and is being denied at this time for the reasons stated....
 
 [135]
 

 On September 24, 2004, the defense made a proffer into the record of its evidence in support of its
 
 Peart
 
 motion.
 
 [136]
 
 Three staff attorneys with the public defenders’ office testified as to Ware’s inability to provide training, assistance and supervision due to his heavy caseload. Ware described the administrative demands of his position, including staffing concerns that arose in his office during the time period of his re-appointment to Reeves’ case. Ware testified that his caseload prevented him from providing competent representation to Reeves and the rest of his clients. Ware concluded by stating he did not think he was competent under the standards for constitutionally effective representation announced in
 
 Strickland,.
 

 In addition to this testimony, the defense proffered several exhibits into the record, including a list of Ware’s cases; a listing of the mandatory life cases pending in the public defenders’ office; the
 
 curriculum vitae
 
 of Dane Ciolino, the defense’s expert; the ABA 10 Principles of a Public Delivery System; an ethics opinion of the American Council of Chief Defenders; and a case from a federal appellate court.
 

 The defense took a writ to the court of appeal from the court’s September 15, 2004 ruling. The court of appeal subsequently denied the writ, and a requested stay of the trial, finding the following:
 

 There is no error in the trial court’s ruling denying Defendant’s September 2 [sic; September 3], 2004
 
 Peart
 
 motion. This issue was previously raised by the Defendant, and was denied on March 23, 2004. The Defendant did not seek review of the trial court’s ruling.
 

 |(i6Further, the Defendant failed to demonstrate a significant change in circumstances, between March 23, 2004 and September 2, 2004, warranting either a hearing on his repetitive motion or the grant of relief, which was previously denied.
 

 Additionally, the Defendant failed to submit proof regarding all of the factors enumerated in
 
 State v. Peart,
 
 92-907 (La.7/2/93), 621 So.2d 780, which are necessary before application of a rebut-table presumption of ineffectiveness to the Public Defender’s Office.
 

 For these reasons, the Defendant’s writ application is denied.
 
 [137]
 

 Analysis
 

 This court has previously held that “[a] claim of ineffectiveness is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal.”
 
 State v. Miller,
 
 1999-0192 p. 25 (La.9/6/00), 776 So.2d 396, 411,
 
 cert. denied,
 
 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001). While it is generally true that ineffectiveness claims are considered on post-conviction,
 
 Peari
 
 held that a claim of ineffectiveness may be raised pretrial, based on counsel’s ability to provide constitutionally effective counsel due to resources available and caseload concerns. In this case, the
 
 Peart
 
 motions raised pretrial dealt with the pretrial circumstances alleged, and the district court made its ruling based on those circum
 
 *1075
 
 stances. Therefore, our analysis will evaluate the district court’s pretrial ruling only. Although defense counsel on appeal has raised allegations of ineffective assistance of counsel occurring at trial,
 
 [138]
 
 those matters are relegated to post-conviction, where an evidentiary hearing may be conducted, if necessary, to determine the merits of the defendant’s allegations.
 

 In evaluating Ware’s ineffective assistance claim, the district court was required to undertake a detailed examination of the specific facts and circumstances of the case. This detailed examination is necessary because there is no precise [^definition of reasonably effective assistance of counsel, which cannot be defined in a vacuum. Thus, of necessity, each ineffective assistance claim demands an individual, fact-specific inquiry.
 
 See Peart,
 
 621 So.2d at 788. As stated in
 
 Peart,
 

 ... the true inquiry [for the district court] is whether an
 
 individual
 
 defendant has been provided with reasonably effective assistance, and no general finding by the trial court regarding a given lawyer’s handling of other cases, or workload generally, can answer that very specific question as to an individual defendant and the defense being furnished him.
 
 Id.,
 
 621 So.2d at 788 (emphasis in original).
 

 In reviewing a district court’s decision on a claim of ineffective assistance, “we take reasonably effective assistance of counsel to mean that the lawyer not only possesses adequate skill and knowledge, but also that he has the time and resources to apply his skill and knowledge to the task of defending each of his individual clients.”
 
 Peart,
 
 621 So.2d at 789.
 

 Procedurally, when the
 
 Peart
 
 allegations were originally raised orally, the district court determined that the defense had not made a sufficient showing for the court to make a ruling. Subsequently, the first written
 
 Peart
 
 motion was refused as not being signed by counsel of record. The second written
 
 Peart
 
 motion was denied as failing to present new or different information from the allegations already determined to be insufficient. The court of appeal, when applied to for a writ of review, found no error in these findings.
 

 After reviewing the record and argument of counsel, we find that Ware did not provide sufficient evidence to show that his caseload was so burdensome, and the resources available to him were so limited, as to result in the delivery .of constitutionally ineffective assistance of counsel. The record shows that Ware admitted that the defense’s own expert indicated that Ware’s caseload would not violate ABA guidelines.
 
 [139]
 
 Nor would Ware’s caseload exceed the standards | flSenunciated in the ethics opinion on which the defense relied.
 
 [140]
 
 On cross-examination, Ware admitted that he makes the decision as to those cases with which he will be involved.
 
 [141]
 
 Moreover, Ware also admitted that one of the other capital cases with which he was involved had six attorneys working on the defense.
 
 [142]
 

 The state pointed out mistakes in the listing of Ware’s caseload, including cases not going to trial when Ware had them listed, cases listed as priority cases which were not priorities, cases listed as ready
 
 *1076
 
 for trial which were not in a posture to be tried, cases in which the defendant was not competent so could not be tried, and cases where the defendants were charged with crimes less serious than those indicated on Ware’s list. The state further showed that one of the staff attorneys, whom Ware indicated needed his assistance in defending cases, had been practicing law for ten years.
 
 [143]
 
 Finally, the state revealed that Judge Canaday offered to appoint different counsel to relieve Ware’s caseload burden in three other specific cases, but Ware declined.
 
 [144]
 

 By Ware’s own admission, he could select those cases, other than capital cases, for which he would represent the indigent defendants or for which he would render assistance to staff attorneys within his office.
 
 [145]
 
 Ware did not have a specific division of court for which he was responsible. Ware’s caseload did not exceed ABA guidelines or the guidelines expressed in the ethics opinion proffered in evidence in | ^support of his contention. Ware was assisted by two other attorneys in this matter. He was provided with transcripts of the first trial, attorney notes on evidence and strategy by Reeves’ counsel in the first trial, and access to those attorneys should questions arise. Reeves was provided with funding for each expert witness for which the defense requested financial assistance, including scientific witnesses and a jury consultant.
 
 [146]
 

 By contrast, the evidence submitted in
 
 Peart
 
 was much more detailed and showed, beyond doubt, the burdensome nature of the attorney’s caseload and the complete lack of resources available to him in his attempt to represent his indigent clients. The public defender
 
 in Peart,
 
 Rick Teissier, presented evidence that, at the time of his appointment, he was personally handling 70 active felony cases. His clients were routinely incarcerated 30 to 70 days before he was able to meet with them. In a seven month period, Teissier represented 418 defendants. Of these, he entered 130 guilty pleas at arraignment. Teissier had at least one serious case, defined as an offense necessarily punishable by a jail term which may not be suspended (including first degree murder, second degree murder, aggravated rape, aggravated kidnapping, armed robbery and possession of heroin), set for trial for every trial date during that seven month period. Teissier’s public defender’s office only had enough funds to hire three investigators to assist in the investigation of 7000 cases annually in ten sections of court. Teissier presented evidence that in a routine case, he received no investigative support at all. The public defender’s office had no funds for expert witnesses; its library was inadequate.
 
 Peart,
 
 621 So.2d at 784.
 

 We find the circumstances which were confronting Ware are easily 17ndistinguishable from the circumstances with which attorney Teissier had to contend as public defender in
 
 Peart.
 
 Moreover, our own review of the record shows
 
 *1077
 
 that Reeves’ counsel acted professionally and knowledgeably throughout the pretrial proceedings. Counsel’s representation, especially when challenging the scientific evidence presented by the state, showed tremendous preparation and skill. We find no error in the district court’s ruling which held that Ware failed to provide sufficient evidence to show that his caseload was so burdensome, and the resources available to him were so limited, as to result in the delivery of constitutionally ineffective assistance of counsel.
 
 See also State v. Lee,
 
 2005-2098 p. 42-43 (La.1/16/08), 976 So.2d 109, 138,
 
 cert. denied,
 
 — U.S. —, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008).
 

 Denial of Motion for Continuance
 

 The defense contends that the district court’s denial of a motion for continuance, filed a week before trial, rendered Reeves’ right to counsel “an empty formality.”
 
 [147]
 

 The record shows that the district court originally upset the date for the retrial at the March 23, 2004 hearing due to the issue of lack of funding. At that time, a new date for the retrial was set for October 12, 2004. Consequently, Ware and St. Dizier, later joined by White, had approximately six and a half months to prepare for Reeves’ retrial. The record shows that the defense filed a motion for continuance on October 5, 2004;
 
 [148]
 
 and an expedited hearing on the motion was held on October 6, 2004.
 
 [149]
 

 At the hearing, Ware and St. Dizier argued they had not had sufficient time to prepare, that the case involved complicated issues which required more analysis, that they had recently discovered a missing box of information provided by former 171 counsel, and that, in St. Dizier’s case, ongoing concerns with ill and elderly parents had prevented him from completing his preparation.
 
 [150]
 
 White added that DNA test results were outstanding, but were expected within the next week.
 

 The district court denied the defense motion for continuance, stating that the court had carefully monitored the case since its reassignment to original counsel.
 
 [151]
 
 After reciting the test for ineffective assistance of counsel in
 
 Strickland v. Washington,
 

 [152]
 

 Judge Canaday indicated that the defense fears of ineffectiveness to date were premature: “[u]p to this point the Court cannot say that there’s been any deficiency nor has [sic] any specific deficiencies been pointed out, only some possibilities that may occur which may or may not be an issue further down the road.”
 
 [153]
 
 The court noted the defense had aggressively challenged new issues and evidentiary matters raised by the state.
 
 [154]
 
 In acknowledging that the defense was currently in a pretrial posture, Judge Canaday commented:
 

 
 *1078
 
 While the Defense team may not feel they are ready to proceed, that is based on an internal assessment and is not consistent with the Court’s review of both the adversarial proceedings as well as the ex parte proceedings of which the record will speak for themselves on a number of occasions.
 
 [155]
 

 In reviewing the guidelines adopted by the American Bar Association relating to the performance of defense counsel, and considered by the Supreme Court in |72reviewing claims regarding effectiveness of counsel in a capital case, the district court found that each factor was satisfied by defense counsel.
 
 [156]
 
 Judge Canaday noted that Ware had established a relationship with the defendant, both through representation on Reeves’ simple escape case and upon Ware’s being reappointed to the capital representation. The district judge stated that, not only had defense counsel indicated on the record that they had discussed matters with their client on a number of occasions, defense counsel also brought to the court’s attention that they had taken advantage of the unique opportunity to discuss the case with prior counsel on several occasions.
 
 [157]
 
 To the extent that the judge was aware of the defense’s investigation, the district court was satisfied that a complete and thorough investigation was being conducted. Important to this consideration was the defense’s knowledge of and access to the state’s complete first trial and the retention of the same experts. Although the district court had been informed for the first time about the missing file box, the court believed the defense had sufficient time to develop an appropriate mitigation strategy, considering the independent work the defense had already made on those issues.
 
 [158]
 
 As far as the factor of the defense counsel’s caseload, Judge Canaday deferred to the record of the March 23, 2004 hearing and the information conveyed in the proffer of September 24, 2004 as to Ware’s unique position and workload.
 
 [159]
 
 Finally, the court was aware of “no stone that has been left unturned by the Defense team up to this point leading up and to jury selection and ultimately 17Strial.”
 
 [160]
 
 The district judge denied defense counsel’s motion for continuance, filed a week before trial was to commence, finding the motion had no merit.
 
 [161]
 

 This Court has consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. La.C.Cr.P. art. 712;
 
 [162]
 

 State v. Turner,
 
 2008-0289 p. 1 (La.2/8/08), 974 So.2d 12;
 
 State v. Blank,
 
 2004-0204 p. 9
 
 *1079
 
 (La.4/11/07), 955 So.2d 90, 140,
 
 cert. denied,
 
 - U.S. -, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007).
 
 Blank
 
 additionally-noted that this court “generally declines to reverse convictions even on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice.”
 
 Id.
 

 We find no abuse of discretion in the district court’s denial of the defense motion for continuance. Defense counsel had almost seven months to prepare for Reeves’ retrial. For four and a half months of that time period, the defense additionally had available the transcripts and evidence consisting of the entire first trial presented by the state, information and materials compiled by counsel for the first trial, and the opportunity to confer with prior counsel. The testimony at the motion hearing shows that the defense availed itself of those advantages, consulting with prior counsel on more than one occasion and even requesting additional assistance from other defense entities. The record shows that the district court closely monitored the case, holding a status hearing every week to address any impediments in a timely fashion and to resolve them as they arose.
 
 [163]
 
 Thus, the district court had |74a more extensive knowledge of counsel-preparedness than in the typical case.
 
 [164]
 
 We find the district court carefully considered the circumstances of this ease in making its ruling and we find no abuse of discretion in its denial of the defense motion for continuance. Further, in our review of the record, we find no example of specific prejudice suffered by the defendant as a result of the denial of this motion for continuance.
 
 [165]
 

 Conflict of Interest
 

 The defendant contends that Ware had a conflict of interest in representing him on the first degree murder charge. The basis for this contention is the fact that Ware had an actual conflict of interest in his representation of Reeves on the separate escape charge, which ultimately resulted in the reversal of that conviction. In a misleading argument, which confuses the records of each case, defense counsel on appeal cites to attorney statements found in a hearing within the escape case, and information disclosed in the
 
 Jackson
 
 hearing in the present case, as support for his contention: (1) that Ware had a conflict of interest
 
 in this case;
 
 (2) that Ware informed the court of a conflict of interest
 
 in this case;
 
 and (3) that Ware objected on the record
 
 in this case
 
 to a conflict of interest. A review of the record, and of the court of appeal’s reported decision reversing Reeves’ conviction on the escape charge, contradict these meritless implications.
 

 Attempted Simple Escape Charge
 

 17⅞While awaiting trial on the instant first degree murder charge, Reeves and another prisoner tried to escape from the
 
 *1080
 
 Calcasieu Correctional Center.
 
 [166]
 
 Reeves was charged with attempted simple escape.
 
 [167]
 
 Ware was appointed to represent him on that charge. At that time, Cuccia and da Ponte represented Reeves on the first degree murder charge.
 

 Within the escape matter, Ware filed a motion on Reeves’ behalf for the appointment of “conflict-free counsel,” asserting that the public defender’s office had a conflict of interest in representing Reeves on the escape charge due to the fact that the public defender’s office represented many of the inmates at the correctional center where Reeves was held.
 
 [168]
 

 A hearing was held on Ware’s motion on February 4, 2004, and the transcript of that hearing within the escape prosecution was, for unknown reasons, placed into the record of the first degree murder case.
 
 [169]
 
 At the hearing, Ware asserted that Reeves’ co-defendant on the escape charge, for a period of time, as well as other prisoners housed in the facility from which Reeves tried to escape (and thus potential witnesses at the trial on the escape charge), were clients of the public defender’s office.
 
 [170]
 
 Ware asserted that, if new counsel were not appointed for Reeves, the public defender’s office would be put in the position of cross-examining its present or former clients while defending Reeves on the escape charge. Ware urged caution in the court’s ruling on the conflict motion, knowing that a conviction on the escape charge would likely be used in the penalty phase of Reeves’ pending prosecution for 17(ifirst degree murder. Should the escape conviction be later reversed, there might be implications for a death sentence obtained with the introduction of evidence regarding the escape conviction. After hearing the arguments of counsel, the district court denied the motion, stating that any potential conflicts with specific witnesses could be dealt with at the trial of the escape charge.
 
 [171]
 

 During the trial on the escape charge, the state called as a witness inmate Kevin Courville, who was a former client of the public defender’s office. Several attorneys in that office represented Courville on several different charges, including Ware. Ware again raised the issue of conflict of interest in the trial of the escape charge, complaining that he would have to cross-examine a former client. The district court found an actual conflict of interest, but allowed the trial on the escape charge to continue after Courville waived his attorney-client privilege. Reeves was convicted of attempted simple escape.
 

 On appeal, the court of appeal reversed Reeves’ escape conviction and vacated the sentence.
 
 [172]
 
 The Third Circuit determined that, having found an actual conflict of interest, the trial court was required to take the proper steps to protect Reeves’ right to effective assistance of counsel. The appellate court held that the conflict was not the witness’ to waive; rather, the only proper recourse to protect Reeves’ right to effective counsel was to appoint new counsel who did not have a conflict of interest with the state’s witness. The court of appeal did not reverse Reeves’
 
 *1081
 
 conviction for attempted simple escape until after his retrial for first degree murder.
 

 First Degree Murder Charge
 

 At the March 23, 2004 hearing at which the district court reappointed Ware to represent Reeves in his retrial, and in hearings held thereafter, the court noted that |77Ware and Reeves had an attorney-client relationship based on Ware’s representation of Reeves on the attempted simple escape charge.
 
 [173]
 
 At the time of his reappointment, Ware announced to the court that he knew of no conflict of interest which would prevent him from representing Reeves on the first degree murder charge.
 
 [174]
 

 The state gave the defense pretrial written notice of its intention to use the attempted simple escape conviction as evidence of Reeves’ character and propensities in the penalty phase, should a penalty phase become necessary upon Reeves’ conviction on the first degree murder charge.
 
 [175]
 
 A pretrial hearing was held to determine what information the state would be allowed to admit into evidence on Reeves’ prior convictions. At that time, then-defense counsel da Ponte indicated at the hearing that Ware, whose office represented three of the possible inmate witnesses on the escape charge, informed her that he was advising his clients to assert their Fifth Amendment rights and would not allow da Ponte to speak to the inmates on behalf of Reeves.
 
 [176]
 
 At the conclusion of the hearing, the district court ruled that the state’s evidence of Reeves’ attempted sim-pie escape conviction would be admissible in the penalty phase of the first degree murder trial.
 
 [177]
 

 Reeves’ first trial did not hold a penalty phase because the jury failed to reach a unanimous decision on guilt. Consequently, there was no mention of the escape conviction in Reeves’ first trial. Although the evidence of the escape conviction was ruled admissible prior to the retrial of Reeves’ first degree murder charge, the state, perhaps anticipating the reversal of the escape conviction, refrained from introducing |78any evidence of that escape conviction in the penalty phase on retrial.
 

 Analysis
 

 As a general rule, Louisiana courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant whom he is representing.
 
 State v. Cisco,
 
 2001-2732 p. 17 (La.12/3/03), 861 So.2d 118, 129, cert.
 
 denied,
 
 541 U.S. 1005, 124 S.Ct. 2023, 158 L.Ed.2d 522 (2004). An actual conflict of interest has been defined, as follows:
 

 If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to the other client.
 
 [178]
 

 The issue of conflicting loyalties may arise in several different contexts,
 
 [179]
 
 but may include the circumstance “where an attor
 
 *1082
 
 ney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney.”
 
 Cisco,
 
 2001-2732 p. 17, 861 So.2d at 129,
 
 citing State v. Tart,
 
 1993-0772 p. 19 (La.2/9/96), 672 So.2d 116, 125,
 
 cert. denied,
 
 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996).
 

 If the issue of counsel’s alleged conflict of interest is raised in a pretrial setting, the district court has two options: “appoint separate counsel or take adequate steps to ascertain whether the risk of a conflict of interest is too remote to warrant separate counsel.... Failure to do one or the other in a case in which an actual conflict exists requires reversal.”
 
 Cisco,
 
 2001-2732 p. 17, 861 So.2d at 130. If the issue of counsel’s alleged conflict of interest is not raised until after trial, “the defendant must prove that an actual conflict of interest adversely affected his lawyer’s performance.” |
 
 79State v. Kahey,
 
 436 So.2d 475, 484 (La.1983). Because the prejudice to the defendant may be subtle, even unconscious, “where the conflict is real, a denial of effective representation exists without a showing of specific prejudice.”
 
 Id.,
 
 436 So.2d at 485.
 

 The first step in the analysis of an alleged conflict of interest raised either pretrial or post-trial is whether an actual conflict of interest existed. We find it to be unnecessary to determine the timing of the challenge in this case because we find that Reeves fails to prove that his counsel labored under a conflict of interest while representing him for first degree murder.
 
 [180]
 
 There was no actual conflict in Ware’s representation of Reeves in the guilt phase of the first degree murder trial because Ware was not called upon to cross-examine any of his former or current clients in the state’s prosecution. Furthermore, there was no actual conflict of interest in the penalty phase because the state did not present evidence of Reeves’ prior conviction for attempted simple escape. Even if the state had presented evidence of this prior conviction, and a former or current client of Ware had been called to testify by the state, the district judge would have had available to him the alternative remedy of having second chair counsel, who was not similarly conflicted, conduct the cross-examination of those witnesses.
 
 See Cisco,
 
 2001-2723, p. 25, 861 So.2d at 134.
 

 The nature of Ware’s conflict of interest in the escape trial was based on the |Sqfact that the state called, as a witness in the escape trial, a former client of Ware’s. The conflict of interest in that trial had nothing to do with Ware’s relationship with Reeves
 
 per se.
 
 Consequently, defense counsel on appeal cannot bootstrap
 
 *1083
 
 Ware’s conflict of interest in the escape trial, based on Ware’s representation of other indigent client witnesses in that representation, to Ware’s representation of Reeves on the first degree murder charge, based on an argument that “once conflicted, always conflicted.” Since no actual conflict of interest ever arose in his first degree murder trial, Reeves fails to prove reversible error in this assignment of error.
 

 Finding that none of the assignments of error raised by the defendant constitute reversible error, we now review the record to determine if the sentence of death imposed in this case is constitutionally excessive.
 

 CAPITAL SENTENCE REVIEW
 

 Article 1, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.C.Cr.P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. Rule 28, § 1, which provides:
 

 Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
 

 (a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
 

 (b) whether the evidence supports the jury’s finding of a statutory aggravating circumstance, and
 

 (c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
 

 la) Passion, Prejudice or any other Arbitrary Factors
 

 The defendant argues the removal of the attorneys of the Capital Defense 181Project and the re-appointment of the local Chief Public Defender as his counsel in the retrial of this matter resulted in the death penalty being wantonly, freakishly and arbitrarily imposed. Our analysis of the defendant’s assignments of error with regard to counsel issues, discussed in the main opinion, has found that this was not so. In other assignments of error, discussed in the unpublished appendix, the defendant urges that arbitrary factors were introduced into both the culpability and penalty phases of trial. We have analyzed each assignment of error under established principles of law and determined that each issue raised was without merit.
 

 Further, nothing in the record suggests prejudice was an issue in the trial. Defendant, an adult white male, raped and stabbed to death a 4 year old white female child and received a sentence of death. Both the defendant and the victim were local residents in a small community. The jury which determined culpability and sentence was selected from another jurisdiction, and consisted of 7 white jurors and 5 black jurors, 7 men and 5 women. The jury venire was questioned thoroughly to discover instances of prejudicial pretrial publicity.
 

 In the Uniform Capital Sentence Review, the district judge noted that, during specific portions of the trial, one or more jurors became visibly emotional. Despite this observance, the trial judge concluded: “[w]hile noting the brief emotional incidents, it is the Court’s opinion and observation that passion, prejudice or arbitrary factors did not influence the jury in imposing sentence, but were human reaction to fact situations.”
 
 [181]
 
 Our independent re
 
 *1084
 
 view of the record finds no indicia of improper passion, prejudice or arbitrariness,
 

 (b) Statutory Aggravating Circumstances
 

 The jury in its verdict found the following aggravating circumstances:
 

 | ¡aCA) the offender was engaged in the perpetration or attempted perpetration of aggravated rape (La.C.Cr.P. art. 905.4(A)(1));
 

 (B) the victim was under the age of twelve years (La.C.Cr.P. art. 905.4(B)(10)); and
 

 (C) the offense was committed in an especially heinous, atrocious, or cruel manner (La.C.Cr.P. art. 905.4(A)(7)).
 
 [182]
 

 Pursuant to La.C.Cr.P. art. 905.3, a jury need find only one aggravating circumstance in order to consider imposing a sentence of death.
 
 [183]
 
 It is undisputed that the victim, M. J.T., was under the age of 12 years. Consequently, the evidence undeniably supports the jury’s finding of that statutory aggravating circumstance, and the sentence of death is adequately supported by the existence of an aggravating factor.
 

 Although we could end our analysis of whether the evidence supports an aggravating circumstance at this point, we find the evidence fully supports the other aggravating circumstances unanimously found by the jury, as well. Rape is defined as: “the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent.” La. R.S. 14:41(A). Aggravated rape is defined at La. R.S. 14:42, in pertinent part:
 

 § 42. Aggravated rape
 

 A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
 

 (1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
 

 (2) When the victim is prevented from resisting the act by threats lasof great and immediate bodily harm, accompanied by apparent power of execution.
 

 (3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
 

 (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim’s age shall not be a defense.
 

 As demonstrated by the jury’s verdict during the guilt phase of the trial, the state presented sufficient evidence to prove beyond a reasonable doubt that defendant was engaged in the perpetration of the aggravated rape of a child who was under the age of 12 when he killed this four year old victim. As previously stated, sufficiency of the evidence was not urged as an assignment of error in this appeal. Indeed, appellate defense counsel, during oral argument in this court, described the state’s evidence against the defendant as “overwhelming.” We agree.
 

 In the guilt phase of trial, the jury learned that the defendant admitted to abducting M.J.T. and taking her to an isolated area where he began to molest her. Although he claimed that he could
 
 *1085
 
 not recall what transpired thereafter, he admitted that he came to himself, alone, at his vehicle, with his pants unzipped and his pocket knife missing. The brutally-assaulted body of M.J.T. was found in the isolated area described by the defendant. The evidence showed she had been anally raped and repeatedly stabbed. Expert forensic analysis matched the semen obtained from a rectal swab of the victim to Reeves’ DNA profile, with a statistical probability of 1 in 256,000,000,000 (trillion). In addition, fibers consistent with the victim’s clothing were found in the defendant’s car. A man-trailing dog alerted to the passenger side of the defendant’s vehicle after receiving a scent exemplar of the victim. We find the evidence supports the jury’s unanimous finding that the defendant killed M.J.T. during the perpetration or attempted perpetration of an aggravated rape.
 

 Finally, this court “has given the statutory aggravating circumstance of latheinousness a narrow construction, requiring ‘that to be valid there must exist elements of torture, pitiless infliction of unnecessary pain or serious bodily abuse prior to death.’ ”
 
 State v. Manning,
 
 2003-1982 p. 67-68 (La.10/19/04), 885 So.2d 1044, 1103, cert.
 
 denied,
 
 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005);
 
 see also State v. Brogdon,
 
 457 So.2d 616, 630 (La.1984),
 
 cert. denied,
 
 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). “Torture requires evidence of serious physical abuse of the victim before death.”
 
 Manning,
 
 2003-1982 p. 69, 885 So.2d at 1104;
 
 State v. Sonnier,
 
 402 So.2d 650, 659 (La.1981), ce
 
 rt. denied,
 
 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). In addition, “[t]his Court has also held that the murder must be one in which the death was particularly painful and one carried out in an inhumane manner.”
 
 Manning,
 
 2003-1982 p. 68, 885 So.2d at 1103. A victim’s “awareness of impending doom” is relevant to a finding of heinousness.
 
 Manning,
 
 2003-1982 p. 70, 885 So.2d at 1104.
 

 During the guilt phase of the trial, the jury was exposed to the exact manner in which the defendant inflicted the fatal wounds upon M.J.T. The 4 year old victim was stabbed 16 times. The victim’s hands showed defensive wounds, revealing her awareness of the assault, and her attempt to protect herself. The victim’s neck was cut for two-thirds of its entire circumference. MJ.T.’s legs were scraped, showing she had been dragged. Although she sustained multiple stab wounds in the heart, the coroner testified that she survived for some time despite this incredible trauma.
 
 [184]
 
 We Isrjfind the evidence presented fully supports the jury’s unanimous finding of the remaining statutory aggravating cir
 
 *1086
 
 cumstance, and that the offense was committed in an especially heinous, atrocious or cruel manner.
 

 (c) Proportionality to the Penalty Imposed in Similar Cases
 

 Federal constitutional law does not require a proportionality review.
 
 Pulley v. Harris,
 
 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La. Sup.Ct. R. 28 § 4(b) provides that the district attorney shall file with this court a list of each first degree murder case in the district in which the sentence was imposed after January 1, 1976. This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender.
 

 The Sentence Review Memorandum submitted by the state reveals that, since 1976, sixty-eight defendants have been charged with one or more counts of first degree murder in the Fourteenth Judicial District. Of that number, nineteen have proceeded to trial on the charge of first degree murder.
 
 [185]
 
 Of those nineteen first degree murder prosecutions, juries have returned verdicts of guilty as charged and a |R(isentence of death on nine occasions.
 
 [186]
 
 Two of those convictions have been reversed and are awaiting retrial.
 
 [187]
 
 In six of those convictions, the death sentence has been reduced to a life sentence on appeal or on federal habeas review, or the defendant was found to be mentally retarded or incompetent to assist in his appeal.
 
 [188]
 
 One of the nine defendants who was sentenced to death has been executed.
 
 [189]
 

 From these facts, the defendant argues that the death penalty in the Fourteenth Judicial District is imposed in a wanton and freakish manner, considering the small number of cases in which a jury in that jurisdiction actually imposes death.
 
 [190]
 
 
 *1087
 
 However, we note that the vast majority of cases which have been indicted as a first degree murder in this jurisdiction involve a killing during either a robbery or a drug-related offense.
 
 [191]
 
 Children have been the victims in only four of the sixty-eight first degree murder indictments. Only one of the cases with a child victim has facts | ^comparable with the instant case,
 
 State v. Langley.
 

 [192]
 

 After an involved case history,
 
 Langley
 
 is currently awaiting retrial.
 

 Given the scarcity of comparable cases in Calcasieu Parish, this court has held that we may look beyond the judicial district in which the sentence was imposed and conduct the proportionality review on a state-wide basis. A state-wide review of cases reflects that jurors find the death penalty appropriate in cases in which the victim is a young child and where the murder is committed during the perpetration or attempted perpetration of an aggravated rape.
 
 See State v. Connolly,
 
 1996-1680 p. 19 (La.7/1/97), 700 So.2d 810, 823 (and cases cited therein, 1996-1680 p. 19 n. 11, 700 So.2d at 823, n. 11).
 

 The Uniform Capital Sentence Report (“UCSR”) and the Capital Sentence Investigation Report (“CSIR”) indicate the defendant, Jason Reeves, is a white male born on January 8,1975. He was 26 years old at the time of the offense. Defendant is unmarried and has no children or other dependents. He was living with his mother at the time he murdered M. J.T.
 

 Reeves is one of three children born to the on-again, off-again common law union of Judy Ann Doucet and Larry Manuel Reeves. The defendant grew up in the rural community of LeBleu Settlement near Lake Charles and Iowa, Louisiana. Reeves’ parents separated for a significant period of time during Reeves’ early Isschildhood, during which time his mother married Dennis Mott, whom Reeves’ mother described as emotionally abusive to her and her children.
 

 One of Reeves’ siblings, Patricia Renee, was killed in a tragic accident in 1986, when Reeves was 9 or 10 years old. His other sibling, Ronald Wayne, is currently serving a life sentence at the state penitentiary for a murder he committed in 1994. Reeves was sexually abused by a friend of the family, George Reed, when he was 14 years old. Reed was charged with the aggravated rape of Reeves, but was allowed to plead guilty to aggravated crime against nature.
 

 
 *1088
 
 Reeves’ parents indicated Reeves suffered from headaches and black outs from the time he was a small child but denied any mental health problems. He is of medium intelligence, with an IQ within the 70 to 100 range. Reeves dropped out of school before completing the 7th grade, where he was a below average student academically and a disciplinary problem. He has not obtained a GED. He has no other formal education or job training.
 

 Reeves’ past employment history is described in reports generally as “various labor positions” of unknown duration. For an unknown period of time, Reeves worked as a deckhand for an oil field related company. He was working as an insulator for an insulation company at the time he murdered M.J.T.
 

 At trial, the defense presented extensive evidence of Reeves’ character and behavioral disorders, both to challenge the validity of the confession and in the penalty phase as mitigation. According to an expert forensic psychologist, Reeves suffers from major depression and mixed personality disorder, with borderline and antisocial personality traits. Another defense expert related that the defendant exhibits emotional instability, volatile interpersonal relationships, anger, mood swings and im-pulsivity. However, Reeves does not suffer from a mental disease or Isadefect which would prevent him from being able to distinguish right from wrong.
 

 Reeves had a prior criminal history. The UCSR and CSIR relate that Reeves had two juvenile adjudications for burglary, one occurring June 11, 1991, and the other occurring June 17, 1991. On October 10, 1991, he was adjudicated a delinquent and sentenced to four years at a juvenile detention facility.
 
 [193]
 
 His adult record includes a conviction for indecent behavior with a juvenile, which occurred on January 3, 1996. He was sentenced to four years hard labor, with three years of the sentence suspended. His probation for this offense was revoked on May 5, 1997, when he pleaded guilty to another charge of indecent behavior with a juvenile, with this offense occurring on March 29, 1997. He was sentenced to four years and was released from incarceration on March 29, 2001, after serving the entirety of his sentence. The CSIR shows that at the time the report was completed, Reeves had two pending charges for obscenity, as well as simple battery and criminal trespass. As previously stated within this opinion, Reeves’ conviction for attempted simple escape was reversed on appeal.
 

 In the UCSR, the trial judge noted, in answer to whether the sentence is disproportional: “As to comparing this case with other cases, this is clearly the worst factual case scenario presented to this Judge to date.”
 
 [194]
 
 A comparison of this case with other, similar, first degree murder cases in the state as a whole convinces this court that the death sentence imposed in this case is not a disproportionately harsh sentence, considering the offense and the offender.
 

 lanDECREE
 

 For the reasons assigned herein, the defendant’s conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either:
 
 *1089
 
 (1) the defendant fails to petition timely the United States Supreme Court for cer-tiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Public Defender Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:169; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
 

 AFFIRMED.
 

 *
 

 Calogero, C.J., retired, recused. Chief Justice Calogero recused himself after oral argument and he has not participated in the deliberation of this case.
 

 [1]
 

 . La. Const. art. 5, § 5(D) provides in pertinent part:
 

 (D) Appellate Jurisdiction. In addition to other appeals provided by this constitution, a case shall be appealable to the supreme court if ... (2) the defendant has been convicted of a capital offense and a penalty of death actually has been imposed.
 

 [2]
 

 . The record of this case consists of 44 volumes (hereinafter Vol. 1-44), a 4-volume supplement (hereinafter 1st Supp.Vol. 1-4), a 1-volume supplement (hereinafter 2nd Supp.), exhibits (hereinafter identified as Ex. # x), and a box labeled "All Documents Under Seal" which contains numerous documents filed under seal and transcripts of
 
 ex parte
 
 hearings. Reference in this opinion will be made to the volume number, if any; the page number within the numbered volumes and supplements; the exhibit and its identifying number; and/or any other identifying information for the documents filed under seal or
 
 ex parte.
 

 [3]
 

 .Public disclosure of the name of a juvenile crime victim, when the crime results in the death of the victim, is not prohibited by La. R.S. 46:1844(W) (which seeks to ensure the confidentiality of crime victims who are minors and victims of sex offenses). Nevertheless, throughout this opinion the victim and her family will be identified only by their initials.
 

 [4]
 

 .This initial questioning from 10:45 p.m. until 12:40 a.m. was, in fact, a polygraph examination to which Reeves agreed to submit. After taking the test, Reeves overheard or was told that he had failed. Although one of the detectives testifying at trial made a brief comment, unresponsive to questioning, about the fact that Reeves took a polygraph examination, the jury was not informed of the lie detector test's results, nor was the fact that Reeves underwent a polygraph examination otherwise disclosed. The brief mention of the fact that Reeves submitted to a polygraph examination is discussed in Assignment of Error 12 in the unpublished appendix.
 

 [5]
 

 . A key code was necessary to enter the area but not to exit.
 

 [6]
 

 . Vol. 39, p. 9549.
 

 [7]
 

 . At trial, the state presented evidence in the form of a map which showed the close proximity of the various locations involved in the case. The McFatter Trailer Park is 3 miles from the Moss Bluff school, where the defendant was seen prior to M.J.T.'s disappearance. LeBleu Cemetery is 3.8 miles from the bridge on Charles Breaux Road. The bridge is 18.3 miles from the defendant's house. The defendant's house is 8.2 miles from the ceme-teiy. From the defendant’s house to the trailer park to the cemetery is 8.2 miles.
 

 [8]
 

 . A latent handprint was found on a palmetto leaf along the trail in the woods near the cemetery, approximately 30 yards from where the body was discovered. A fingerprint examiner later examined the print and testified that the print did not have sufficient detail to make an identification. However, the expert was able to eliminate the defendant as the source of the print.
 

 [9]
 

 . Vol. 39, p. 9728.
 

 [10]
 

 . Vol. 1, p. 235. Although Reeves was initially indicted for first degree murder and aggravated kidnapping, at a status conference held on May 21, 2004, prior to the retrial, the state
 
 nol prossed
 
 docket number 20180-01, which had charged Reeves with kidnaping the victim. Vol. 11, p. 2656; Vol. 15, p. 3635.
 

 [11]
 

 . M.J.T.’s neck had a circumference of 9 ⅛ inches. Her neck was cut 6 1/4 inch around.
 

 [12]
 

 . Vol. 43, p. 10580.
 

 [13]
 

 . In an effort to satisfy its constitutional mandate to "provide for a uniform system for securing and compensating qualified counsel for indigents,”
 
 see
 
 La. Const. art. 1, § 13, the legislature implemented statewide standards and guidelines for indigent defense through the Louisiana Public Defender Act of 2007.
 
 See
 
 Acts 2007, No. 307, eff. August 15, 2007;
 
 and
 
 La. R.S. 15:141-184. None of the provisions of the 2007 Act are at issue here.
 

 [14]
 

 . The history of the amendment of these two statutes is set out fully in
 
 Citizen,
 
 2004-1841 p. 8-10, 898 So.2d at 331-333. Briefly, in
 
 State v. Craig,
 
 1993-2515 (La.5/23/94), 637 So.2d 437, this court held that the extant version of La. R.S. 15:304, governing expenses paid by the parishes, could be used as a source of supplemental funding for counsel and expert witness fees in cases in which the resources of the local Indigent Defender Boards were exhausted. Three months after Craig was handed down, the legislature
 
 *1046
 
 amended the statute. La. R.S. 15:304, as amended
 
 in 1994,
 
 added the following provision: "Nothing in this Section shall be construed to make the parishes ... responsible for the expenses associated with the costs, expert fees, or attorney fees of a defendant in a criminal proceeding.” In the same legislation, the legislature deleted language from an earlier version of La. R.S. 15:571.11(A)(1)(a), which had formerly provided for the parish criminal court fund to pay the expenses of attorneys appointed to represent indigent persons under any public defense program.
 

 [15]
 

 . Vol. 13, p. 3141.
 

 [16]
 

 . Vol. 13, p.3143.
 

 [17]
 

 .
 
 See
 
 Vol. 13, p. 3145. Ware represented Reeves at a hearing on the State's response to the defense motion for discovery and inspection held on March 13, 2002.
 

 [18]
 

 . An affidavit by Ronald Ware, attached as an exhibit to a motion filed under seal, indicates that Cuccia, along with other attorneys and investigators on his staff, represented the defendant beginning March 28, 2002.
 
 See
 
 Motion To Stay Proceedings For Lack Of Funds To Provide A Competent Defense, date-stamped March 25, 2004, Exhibit B-Affidavit of Ronald Ware, Box Labeled "All Documents Under Seal." The record shows that Cuccia filed a Motion to Enroll as counsel of record on April 11, 2002. Vol. 3, p. 594. The motion was granted on that same date by Judge Minaldi, who was then the presiding judge. Graham da Ponte filed a Motion to Enroll as counsel of record on July 29, 2002. Vol. 4, p. 941. The motion was granted on August 5, 2002.
 
 Id.
 

 [19]
 

 .
 
 See generally
 
 Vol. 1, p. 59-109. The court minutes from the first trial reflect that the jury deadlocked when it was unable to reach a unanimous verdict at the guilt phase; 11 jurors would have found the defendant guilty of first degree murder and 1 juror would have found the defendant guilty of second degree murder.
 
 See
 
 Vol. 1, p. 109;
 
 see also
 
 Vol. 11, p. 2632.
 

 [20]
 

 .
 
 See
 
 Motion To Stay Proceedings For Lack Of Funds To Provide A Competent Defense, date-stamped March 25, 2004, Exhibit A-Letter dated November 25, 2003 from Kerry Cuccia to Ronald Ware, Box Labeled "All Documents Under Seal.”
 

 [21]
 

 . The defense filed motions entitled "Motion for New Trial Date,” "Motion To Determine Source Of Funds To Provide Adequate Defense for Funding,” and "Motion To Provide Funds Owed.”
 

 [22]
 

 .
 
 See
 
 Motion To Stay Proceedings For Lack Of Funds To Provide A Competent Defense dated March 8, 2004, Box Labeled "All Documents Under Seal.”
 

 [23]
 

 .The question whether Judge Canaday's ruling removing counsel and substituting originally-appointed counsel had a retaliatory basis is negated by the fact that Judge Canaday did not preside over Reeves’ first trial and met Cuccia and da Ponte for the first time at the March 23, 2004 hearing.
 

 [24]
 

 . Ist Supp.Vol. 4, p. 817.
 

 [25]
 

 .
 
 Id.
 

 [26]
 

 .
 
 Id.
 

 [27]
 

 .
 
 Id.,
 
 p. 818.
 

 [28]
 

 . Id., p.818-819.
 

 [29]
 

 .
 
 Id.,
 
 p. 819.
 

 [30]
 

 .
 
 Id.,
 
 p. 819. Ware clarified the record at this point to state that the decision to contract out the case to the Capital Defense Project was actually made by the parish’s Indigent Defender Board. 1st Supp.Vol. 4, p. 819-820.
 

 [31]
 

 .
 
 Id.,
 
 p. 821.
 

 [32]
 

 .
 
 Id.,
 
 p. 823.
 

 [33]
 

 .
 
 Id.,
 
 p. 823-824.
 

 [34]
 

 .
 
 Id.,
 
 p. 824.
 

 [35]
 

 .
 
 Id.
 

 [36]
 

 .
 
 Id.,
 
 p. 824-825.
 

 [37]
 

 . We note that Ware testified in a funding hearing in the
 
 Citizen
 
 case held a little over a month before the hearing held in
 
 Reeves.
 
 At the January 30, 2004 hearing in
 
 Citizen,
 
 this court found “Chief Public Defender Ware underscored the problem facing the court by stating that his office currently owed close to $47,000 for capital defense and expected to owe at least an additional $150,000 in upcom
 
 *1051
 
 ing cases which he had already committed to fund."
 
 Citizen,
 
 2004-1841 p. 4, 898 So.2d at 328. We know from the facts of this case that over $35,000 of the amount owed and $108,000 of the anticipated costs may have been for the
 
 Reeves
 
 case, as Ware was aware of the overage of expenditures for the first trial and the anticipated costs of retrial by Cuccia's November correspondence.
 

 [38]
 

 .1st Supp. Vol. 4, p. 825. Although a different district judge presided in the Citizen case, this court noted that ‘‘[t]he court expressed its frustration with the continued lack of funding [for capital indigent defense in Calcasieu Parish] and the fact that it faces some version of the same funding dilemma in virtually every criminal case before it.”
 
 Citizen,
 
 2004-1841 p. 4, 898 So.2d at 329.
 

 [39]
 

 . 1st Supp. Vol. 4, p. 825.
 

 [40]
 

 .
 
 Id.
 

 [41]
 

 .
 
 Id.
 

 [42]
 

 .
 
 Id.,
 
 p. 828.
 

 [43]
 

 .
 
 Id.,
 
 p. 829. As with the retrial, the jury for the first trial was picked in Baton Rouge and transported to Calcasieu Parish for the remainder of the trial.
 

 [44]
 

 .
 
 Id.,
 
 p. 829.
 

 [45]
 

 .
 
 Id.,
 
 p. 829-830. Ritchie, the original second-chair appointed by the court, had been elected to a judgeship in the 14th Judicial District in the time period between the first trial and the March, 2004 hearing. Consequently, then-Judge Ritchie was not available to be re-appointed second-chair counsel for Reeves' retrial.
 
 See
 
 Vol. 17, p. 4169, 4173.
 

 [46]
 

 . 1st Supp. Vol. 4, p. 830.
 

 [47]
 

 .
 
 Id.
 

 [48]
 

 .
 
 Id.,
 
 p. 831-832.
 

 [49]
 

 .
 
 Id.,
 
 p. 832.
 

 [50]
 

 .
 
 Id.
 

 [51]
 

 .
 
 Id.,
 
 p. 832-833.
 

 [52]
 

 .
 
 Id.,
 
 p. 821-822. Sanchez's presence at the hearing supports Judge Canaday's earlier statement for the record that there had been several- informal discussions by all parties about possible solutions to the lack of funding dilemma. Neither Ware, nor Sanchez, who presented argument on the issue, was surprised by Judge Canaday's proposed solution to remove non-local appointed counsel and to replace them with the capital-certified local Chief Public Defender.
 

 [53]
 

 . A stipulation was entered as to what Ware would testify was his current caseload. 1st Supp. Vol. 4, p. 833-836.
 

 [54]
 

 .
 
 Id.,
 
 p. 821-823, 837-845, 850-852.
 

 [55]
 

 .
 
 Id.,
 
 p. 855.
 

 [56]
 

 .
 
 Id.,
 
 p. 856-857.
 

 [57]
 

 .As will be discussed later in this opinion, Reeves attempted to escape from jail while incarcerated for the instant capital murder charge. Ware represented Reeves at an earlier trial on the charge of attempted simple escape.
 

 [58]
 

 . 1st Supp. Vol. 4, p. 857-859.
 

 [59]
 

 .
 
 Id.,
 
 p. 859.
 

 [60]
 

 .
 
 Id.,
 
 p. 859-860.
 

 [61]
 

 .
 
 Id.,
 
 p. 861.
 

 [62]
 

 .
 
 Id.
 
 In subsequent status conferences, Reeves requested and was granted the opportunity to place on the record his objection to the substitution of counsel. At a June 18, 2004 status conference, Reeves told the court:
 

 I just — I want to make it re-known that I object to my — Kerry Cuccia and Graham daPonte being taken off my case. They’ve been on it for two years and I've come to trust them and I can’t see how Mr. Ware can be ready for trial in October, and I can’t trust him to talk to him like I’ve done my other attorneys. There’s no — I can't — I don’t trust them. I’d rather my other attorneys. Vol. 15, p. 3703.
 

 At that time, the court noted Reeves’ objection. Reeves clarified: "It's not that I don't trust him or doubt his, you know, ability to represent me in trial, I just — I’m more comfortable with my other attorneys." Vol. 15, p. 3704. When the court asked: "If you had a choice you'd rather have Mr. Cuccia is what you're saying,” Reeves responded, "Yes, sir.”
 
 Id.
 

 [63]
 

 .
 
 Id.,
 
 p. 862.
 

 [64]
 

 .Id..,
 
 p. 863. Later in the hearing, Sanchez remarked that the court seemed very certain in its position to appoint Ware, trying to discover whether there was a chance Judge Ca-naday would reconsider his appointment of Ware on the attorney-client issue, and whether a motion for reconsideration would be successful. Judge Canaday stated: "It would probably have to be something much more substantial in black letter law more than what I’d received here in open court, Mr. Sanchez.”
 
 Id.,
 
 p. 876.
 

 [65]
 

 .
 
 Id.,
 
 p. 864. During the ensuing discussion, Cuccia identified the motion as one which was entitled "Motion To Provide Funds Owed,” filed in January.
 
 Id.,
 
 p. 870.
 

 [66]
 

 .
 
 See generally, id.,
 
 p. 864-876.
 

 [67]
 

 . Former La. R.S. 15:144(A) provided in pertinent part: "An indigent defender board, hereinafter referred to as the district board, shall be established in each judicial district ..."
 

 [68]
 

 . Former La. R.S. 15:145(B)(2)(a) provided in pertinent part:
 

 § 145. Powers and duties of the judicial district indigent defender boards
 

 B. Each district board shall select one of the following procedures or any combination thereof for providing counsel for indigent defendants:
 

 [[Image here]]
 

 (2)(a) The district board may employ a chief indigent defender and such assistants and supporting personnel as it deems necessary. ...
 

 [69]
 

 .Former La. R.S. 15:145(B)(3) provided:
 

 § 145. Powers and duties of the judicial district indigent defender boards
 

 B. Each district board shall select one of the following procedures or any combination thereof for providing counsel for indigent defendants:
 

 [[Image here]]
 

 (3) The district board may enter into a contract or contracts, on such terms and conditions as it deems advisable, with one or more
 
 *1059
 
 attorneys licensed to practice law in this state to provide counsel for indigent defendants.
 

 [70]
 

 . Former La. R.S. 15:145(F) provided: "The district board may accept, receive, and use public or private grants. Copies of applications for public or private grants shall be forwarded to the state board.”
 

 [71]
 

 . Former La. R.S. 15:146, as it existed at the time of Reeves' trial, provided in pertinent part:
 

 § 146. Judicial district indigent defender fund
 

 A. There is hereby created within each judicial district an indigent defender fund which shall be administered by the district board and composed of funds provided for by this Section and such funds as may be appropriated or otherwise made available to it.
 

 B. (1) Every court of original criminal jurisdiction ... shall remit the following special costs to the district indigent defender fund for the following violations, under state statute as well as under parish or municipal ordinance. The following costs shall be assessed in cases in which a defendant is convicted after a trial, a plea of guilty or nolo contendere, or after forfeiting bond, and shall be in addition to all other fines, costs, or forfeitures imposed:
 

 (a) Not less than the sum of seventeen dollars and fifty cents for each offense, except a parking violation. Upon recommendation of the district board and by a majority vote of the judges of the courts of original jurisdiction within the district, this sum may be increased to not more than thirty-five dollars ....
 

 [[Image here]]
 

 C. In addition to the funds provided for in Subsection B hereof the state shall pay to each district indigent defender board, on the warrant of its chairman, the sum of ten thousand dollars per annum.
 

 D.The funds provided for in this Section and all interest or other income earned from the investment of such funds shall be used and administered by the district board.
 

 [72]
 

 . Former La. R.S. 15:151(A) provided:
 

 § 151. Indigent Defense Assistance Board
 

 A. There is hereby established in the office of the governor the Indigent Defense Assistance Board.
 

 [73]
 

 . Former La. R.S. 15:151.2(A) provided:
 

 § 151.2. Powers; duties; responsibilities; limitations
 

 A. The board may provide supplemental funds, when appropriated by the legislature for that purpose, to judicial district indigent defender boards only as authorized herein for the purposes of complying with the requirements of the Constitution of Louisiana and the Constitution of the United States of America and specific statutory provisions affording the right to counsel to indigent defendants in criminal cases.
 

 [74]
 

 . Former La. R.S. 15:151.2(D) provided in pertinent part:
 

 § 151.2. Powers; duties; responsibilities; limitations
 

 D. The board shall adopt rules for providing supplemental assistance to the judicial district indigent defender boards, which address the following:
 

 [[Image here]]
 

 (3) Guidelines for supplemental assistance that take into account the failure of the judi
 
 *1060
 
 cial district indigent defender board to provide local counsel in capital cases.
 

 [[Image here]]
 

 (6) Guidelines for supplemental assistance for compensation when the judicial district indigent defender board compensates a lawyer retained to handle a specific case or cases.
 

 [[Image here]]
 

 (8) Guidelines for supplemental assistance that take into account capital cases, appellate cases, expert witnesses, specialized testing and other clearly demonstrated needs.
 

 [[Image here]]
 

 (10) Guidelines for supplemental assistance in specific capital cases for judicial district indigent defender boards which are not otherwise qualified to receive supplemental assistance ....
 

 [75]
 

 . Former La. R.S. 151.2(E)(1) provided: "The board shall have authority by rule, to develop and maintain such programs as necessary to implement the guidelines for supplemental assistance.”
 

 [76]
 

 . Appellant's Supplemental Brief and Response to State's Brief On Appeal, p. 11.
 

 [77]
 

 . Vol. 7, p. 1742-1744;
 
 see also
 
 2nd Supp. p. 41 — 43. At the hearing on the motion to suppress identifications, held on April 17, 2002, then-presiding Judge Minaldi indicated she signed a motion to enroll Cuccia in the case, after ascertaining his awareness of the pending deadlines and motion hearings set in the case. Vol. 13, p. 3235.
 

 [78]
 

 . This relationship is made clear during a discussion at the June 22, 2004
 
 ex parte
 
 hearing, wherein it was stated that Cuccia was involved with the capital conflict panel funded by LIDAB. June 22, 2004
 
 Ex Parte
 
 hearing transcript, p. 31, Box Labeled "All Documents Under Seal."
 

 [79]
 

 .As previously stated, pursuant to former La. R.S. 15:145(B)(3) the district board had the authority to enter into contracts with other attorneys in order to handle specific cases.
 

 [80]
 

 . 1st Supp. Vol. 4, p. 827.
 

 [81]
 

 .
 
 Id.,
 
 p. 830.
 

 [82]
 

 .
 
 See
 
 1st Supp. Vol. 4, p. 873-874. As Cuccia told Judge Quienalty at the September 16, 2003 hearing, he was unsure if a formal appointment had been made. Under the previous indigent system, Cuccia agreed to undertake the representation at the request of the local indigent defender board with the approval of the then-presiding judge. Vol. 7, p. 1743.
 

 [83]
 

 .
 
 Id.,
 
 p. 842.
 

 [84]
 

 .
 
 Id.,
 
 p. 830 (emphasis added).
 

 [85]
 

 . Ware later represented at a hearing held on September 17, 2004, "that Kerry Cuccia and Ms. Graham Da Ponte’ again have told me just days ago that they're willing to resume the representation, should — should the
 
 Peart
 
 motion be granted, or any other relief is granted. So I just want to make that a part of the record as well." The following colloquy ensued:
 

 Court: I mean, what is that a part of?
 

 Ware: A part of the
 
 Peart
 
 issue.
 

 Court: I mean, are you saying without contingencies, without payment, without advancement of experts, everything that was elicited before is now changed, is that—
 

 Ware: No, sir.
 

 Court: — what—the purpose of that comment was?
 

 Ware: No. The thing is, nothing has changed with respect to them willing to take on — or resume the representation. They’re willing to come in without cost or expenses or legal fees for themselves or for their office, with the — but they do— they’re not going to finance the case as far as experts and other related expenses. But they’re willing to resume the representation without costing the parish legal fees.
 

 Court: As far as the statement, we’ll let it be in the record, but I will refer back to the record of March of 2004 as to their position at the time that the counsel was reassigned and the reasons therefore and their position for the record at that time.
 

 See
 
 Vol. 17, p. 4222-4224.
 

 [86]
 

 . Indeed, Ware acknowledged there was no "easy or ready solution” for the problem.
 
 Id.,
 
 p. 825.
 

 [87]
 

 .
 
 Id.,
 
 p. 861.
 

 [88]
 

 .
 
 Id.,
 
 p. 859.
 

 [89]
 

 . Earlier in the argument, Sanchez, on behalf of Ware, addressed the court: "So we would ask the Court find another mechanism, appoint someone else or to delay this trial until funds or such appointment is available.”
 
 Id.,
 
 p. 844.
 

 [90]
 

 . In fact, the record shows that within two months of the hearing, the Capital Defense Project forwarded to Ware eleven boxes regarding the first Reeves trial and an outline of the contents of each box. Vol. II, p. 2680. The boxes contained the entire guilt phase and proposed penalty phase of the first trial, all transcripts, all post-trial pleadings and the various pretrial writs which were filed. In addition, Cuccia and da Ponte supplied Ware with outlines of both the penalty phase and the guilt phase regarding "Witness Points.”
 
 See
 
 letter dated May 18, 2004, stamped "Filed in Evidence” and dated 6/22/04 for the
 
 ex parte
 
 June 22, 2004 hearing, Box Labeled “All Documents Under Seal.” Further, testimony at a September 15, 2004 motion hearing shows that Ware received copies of the state’s opening, closing and rebuttal arguments, and portions of the voir dire of the first trial, as requested by the defense, prior to trial. Vol. 17, p. 4115-4119.
 

 [91]
 

 .
 
 See ex.
 
 Vol. 15, p. 4152.
 

 [92]
 

 . Vol. 15, p. 3648.
 

 [93]
 

 . Vol. 15, p. 4154.
 

 [94]
 

 . In its “Motion to Reconsider Order of March 23, 2004 Substituting Counsel,” filed April 13, 2004, the defense argued generally that Reeves' "... substantive right to the effective assistance of counsel, including the continuity of counsel because of the particular circumstances of this case, guaranteed to him by the 6th, 8th, and 14th Amendments to the U.S. Constitution and Article 1, Sections 2, 3, 13, 16, and 20 of the Louisiana State Constitution, has been violated because of the Court's unsolicited substitution of counsel." Vol. 11, p. 2651. The motion was denied by Judge Canaday. Vol. 11, p. 2652.
 

 [95]
 

 .
 
 Id.,
 
 461 U.S. at 13, 103 S.Ct. at 1617.
 

 [96]
 

 .
 
 Scott,
 
 2004-1312 p. 7, 921 So.2d at 916.
 

 [97]
 

 .
 
 Scott,
 
 2004-1312 p. 14-15, 921 So.2d at 920-921.
 

 [98]
 

 . Although in
 
 State v. Hattaway,
 
 621 So.2d 796 (La.1993),
 
 overruled in part on other grounds, State v. Carter,
 
 1994-2859 (La. 11/27/95), 664 So.2d 367, this court spoke of "constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship,” the court was not referring to the preservation of a particular attorney-client relationship. Instead, the court was referring to the fact that an attorney-client relationship existed at a particular point in those criminal proceedings, and of the rights and prohibitions flowing from the existence of that relationship with regard to the state’s attempts to communicate with a criminal defendant.
 
 Hattaway,
 
 621 So.2d at 807.
 

 [99]
 

 .See
 
 two Ex Parte Orders signed July 19, 2004 based on Ex Parte Motion for Funds for Expert Witnesses, Box Labeled “All Documents Under Seal;” Ex Parte Motion and Order for Expert Assistance, filed September 3, 2004, motions for fingerprint expert, forensic entomologist, DNA consultant and traffic engineer granted, Box Labeled “All Documents Under Seal;” Ex Parte Motion and Order for Expert Assistance (To Be Filed Under Seal), filed September 17, 2004 motion for jury consultant granted, Box Labeled "All Documents Under Seal.”
 

 [100]
 

 .
 
 See
 
 Ex Parte Order signed August 4, 2004, Box Labeled "All Documents Under Seal.”
 

 [101]
 

 . Third Funding and In-Camera Proceeding Held
 
 Ex Parte,
 
 dated August 6, 2004, p.
 
 *1068
 
 17, Box Labeled “All Documents Under Seal.''
 

 [102]
 

 .
 
 Id.
 

 [103]
 

 . We note, however, that the state did not have to pay travel expenses for St. Dizier, except to select a jury in a different jurisdiction, as he was local counsel.
 

 [104]
 

 . June 22, 2004
 
 Ex Parte
 
 hearing transcript, p. 25, Box Labeled “All Documents Under Seal.”
 

 [105]
 

 . September 15, 2004
 
 Ex Parte
 
 Hearing, p. 13, Box Labeled “All Documents Under Seal.”
 

 [106]
 

 . September 17, 2004
 
 Ex Parte
 
 hearing, p. 6-7, Box Labeled "All Documents Under Seal.”
 

 [107]
 

 . In the absence of a reason apparent on the record, we will not speculate as to the budgetary or other concerns facing the Indigent Defender Board and Ware.
 

 [108]
 

 . A capital case is instituted by indictment by a grand jury. La.C.Cr.P. art. 382(A). La. C.Cr.P. art. 578 provides that no trial shall be commenced in a capital case after three years from the date of institution of prosecution. In addition, both the state and a defendant have the right to a speedy trial. La. Const. art. 1, § 16, La.C.Cr.P. art. 701.
 

 [109]
 

 . 1st Supp.Vol. 4, p. 851.
 

 [110]
 

 .
 
 Id.,
 
 p.876.
 

 [111]
 

 . Vol. 17, p. 4190.
 

 [112]
 

 . Vol. 11, p. 2650-2651.
 

 [113]
 

 . Vol. 11, p. 2651.
 

 [114]
 

 . Vol. 11, p. 2652.
 

 [115]
 

 .
 
 See.
 
 Vol. 15, p. 3629-3658.
 

 [116]
 

 . Vol. 15, p. 3642, 3649-3650.
 

 [117]
 

 . Vol. 15, p. 3651-3652.
 

 [118]
 

 .
 
 See
 
 Vol. 15, p. 3660-3706.
 

 [119]
 

 . Vol. 15, p. 3666.
 

 [120]
 

 . Vol. 11, p. 2711; Vol. 15, p. 3710.
 

 [121]
 

 .
 
 See
 
 "Pearl Motion To Preclude The State From Forcing The Public Defender To Behave Unethically Towards Its Clients,” Vol. 11, p. 2701-2705.
 

 [122]
 

 . Vol. 11, p. 2694-2699. This was not the first time that an attorney not of record attempted to file a
 
 Peart
 
 motion on behalf of
 
 *1071
 
 Ware. The record shows that an even earlier
 
 Peart
 
 motion had been filed into the record by attorney Clive Stafford Smith when Ware was first appointed to represent Reeves. On April 17, 2002, the court denied this
 
 Peart
 
 motion in oral reasons, "... inasmuch as Mr. Smith is not the attorney of record and has no standing to file motions in this case.” Vol. 13, p. 3160-3161.
 

 [123]
 

 .Vol. 12, p. 2805, 2812; Vol. 15, p. 3723-3724.
 

 [124]
 

 . Vol. 15, p.3724.
 

 [125]
 

 . Vol. 15, p. 3727.
 

 [126]
 

 . Vol. 15, p. 3727-3728.
 

 [127]
 

 . Vol. 15, p. 3734. Ware signed both the motion to enroll as himself, and on behalf of Ms. Lehmann. Ware also signed the
 
 Peart
 
 motion on behalf of Ms. Lehmann.
 

 [128]
 

 . Vol. 11, p.2714, 2722.
 

 [129]
 

 . Vol. 11, p. 2735. The dissenting judge would have allowed the enrollment of counsel for the purpose of filing and litigating the
 
 Peart
 
 motion.
 
 Id.
 

 [130]
 

 . Vol. 12, p. 2776-2785. The motion was entitled
 
 "Peart
 
 Motion To Preclude The State From Forcing The Public Defender To Behave Unethically Towards Its Clients; To Permit Enrollment of Independent Counsel For Litigating The
 
 Peart
 
 Motion; And To Reinstate Previous Trial Counsel As Appointed Counsel For Mr. Reeves."
 

 [131]
 

 . Vol. 12, p. 2786.
 

 [132]
 

 . Vol. 12, p. 2798-2816.
 

 [133]
 

 . Vol. 17, p. 4172-4173.
 

 [134]
 

 . Vol. 17, p. 4174.
 

 [135]
 

 . Vol. 17, p. 4174-4176.
 

 [136]
 

 .
 
 See generally Vol.
 
 18, p. 4265-4346.
 

 [137]
 

 . Vol. 12, p. 2936.
 

 [138]
 

 .
 
 See
 
 Appellant's Supplemental Brief and Response to the State's Brief on Appeal, p. 12.
 

 [139]
 

 . Vol. 18, p. 4308; Defense Proffer D-C, "Affidavit of Dane Ciolino,” p. 5.
 

 [140]
 

 . Vol. 18, p. 4313.
 

 [141]
 

 . Vol. 18, p. 4321.
 

 [142]
 

 . Vol. 18, p. 4320.
 

 [143]
 

 . Vol. 18, p.4326-4329.
 

 [144]
 

 . Vol. 18, p. 4332; State Proffer 1, excerpt of "Status Conference” held August 4, 2004, p. 2-3.
 

 [145]
 

 . At the September 24, 2004 motion hearing, the court asked Ware if this type of
 
 Peart
 
 motion was pending in all of his first degree murder cases; Ware responded that it was not. Vol. 18, p. 4262.
 

 [146]
 

 .Although the district court did not authorize specific funding for a jury consultant, the district court approved a certain amount of discretionary funding which the defense could use as they saw fit. Sealed
 
 Ex Parte
 
 Status Conference, dated September 3, 2004, p. 37-43, Box Labeled "All Documents Under Seal.”
 

 [147]
 

 . Appellant’s Brief, p. 20.
 

 [148]
 

 . Vol. 12, p. 2926-2927.
 

 [149]
 

 .
 
 See
 
 Vol. 18, p. 4347-4398.
 

 [150]
 

 . The record established that on May 27, 2004, the defense received 11 boxes from Cuccia and da Ponte containing all of their information, documents, trial preparation and strategy from the first trial.
 
 See
 
 Vol. 11, p. 2680. Testimony at the hearing showed that a 12th box, originally looked through by White, and purporting to contain mitigation information, had been lost in transit as the boxes were shared with the Louisiana Crisis Assistance Center, which was providing additional assistance to Ware.
 

 [151]
 

 . Vol. 18, p. 4378.
 

 [152]
 

 . 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 

 [153]
 

 . Vol. 18, p. 4380.
 

 [154]
 

 . Vol. 18, p. 4381.
 

 [155]
 

 . Vol. 18, p. 4381.
 

 [156]
 

 . Judge Canaday specifically mentioned the Supreme Court cases of
 
 Wiggins v. Smith,
 
 539 U.S. 510, 522, 123 S.Ct. 2527, 2535-2536, 156 L.Ed.2d 471 (2003) and
 
 Williams v. Taylor,
 
 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The petitioners in both of these cases had been convicted in state court of murder and sentenced to death. Each brought federal habeas claims of ineffective assistance of counsel based on counsels' failure to investigate and to present substantial mitigating evidence to their sentencing juries.
 

 [157]
 

 . Vol. 18, p. 4382.
 

 [158]
 

 . Vol. 18, p. 4383-4384.
 

 [159]
 

 . Vol. 18, p. 4385-4386.
 

 [160]
 

 . Vol. 18, p. 4386.
 

 [161]
 

 . Vol. 18, p. 4387.
 

 [162]
 

 . La.C.Cr.P. art. 712 provides: "A motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor."
 

 [163]
 

 . Vol. 15, p. 3648.
 

 [164]
 

 . Vol. 15, p. 3651. The court also granted Ware an additional three weeks to prepare for pending motions. Vol. 15, p. 3745.
 

 [165]
 

 . In an attempt to show that the defendant was prejudiced by the denial of the continuance motion, defense counsel on appeal asserts that the record shows that Ware did not watch the videotaped confession in its entirety prior to trial and that, through this ineffective assistance, prejudicial material was placed before the jury. However, defense counsel is factually inaccurate. The record shows that, while Ware watched only portions of the videotape in the months prior to trial, once he was in Baton Rouge for jury selection, he watched the entire videotape. "I would start and stop and start and stop, so that’s why I took it to Baton Rouge." And I said, "Well, I need to sit down and look at this tape, which I did.” Vol. 40, p. 9764 (emphasis added).
 

 [166]
 

 .
 
 State v. Reeves,
 
 2004-0631 p. 2-3 (La. App. 3 Cir. 11/10/04), 890 So.2d 590, 592-593.
 

 [167]
 

 . Vol. 15, p. 3581.
 

 [168]
 

 . Vol. 15, p. 3582.
 

 [169]
 

 .
 
 See
 
 Vol. 15, p. 3580-3623.
 

 [170]
 

 . Vol. 15, p. 3582-3591.
 

 [171]
 

 . Vol. 15, p. 3619-3521.
 

 [172]
 

 .
 
 State v. Reeves,
 
 2004-631 p. 9-11, 890 So.2d at 596-597.
 

 [173]
 

 . 1st Supp. Vol. 4, p. 858, Vol. 17, p. 4175.
 

 [174]
 

 . 1st Supp. Vol. 4, p. 819.
 

 [175]
 

 . Vol. 3, p. 716.
 

 [176]
 

 . 1st Supp. Vol. 4, p. 765.
 

 [177]
 

 . 1st Supp. Vol. 4, p. 769.
 

 [178]
 

 .
 
 Cisco,
 
 2001-2732 p. 18, 861 So.2d at 130,
 
 citing Zuck v. Alabama,
 
 588 F.2d 436 (5th Cir.1979),
 
 cert. denied,
 
 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979).
 

 [179]
 

 .
 
 See State v. Kahey,
 
 436 So.2d 475, 485-486 (La.1983).
 

 [180]
 

 . In this case, Ware did not inform the court of an alleged conflict of interest pretrial in the first degree murder case. Instead, Ware asserted he had no conflict of interest in representing Reeves in this matter. However, the pretrial standard of review would also be applicable if this court found the district judge knew or should have known that the possible conflict issue existed.
 

 The record shows that Judge Canaday presided over the hearing on the conflict motion in the attempted simple escape matter at which Ware claimed his office represented several of the inmates at the jail. Judge Ca-naday also presided over the trial of the attempted simple escape charge where Ware informed him that one of the state's witnesses was a former client. Judge Minaldi presided over the
 
 Jackson
 
 hearing in the first degree murder case and ruled the state’s evidence of Reeves' prior conviction for attempted simple escape was admissible in evidence at a possible penalty phase in the first degree murder trial. Although defense counsel raises a question whether Judge Canaday knew or should have known that there was a possibility for a conflict of interest to arise in the retrial of the first degree murder trial, we find no actual conflict of interest ever arose.
 

 [181]
 

 . Uniform Capital Sentencing Review, Section D(6), "General Considerations.”
 

 [182]
 

 . Vol. 44, p. 10879.
 

 [183]
 

 . La.C.Cr.P. art. 905.3 provides, in pertinent part, "[a] sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death should be imposed.”
 

 [184]
 

 . The coroner's testimony on cross-examination in this regard was as follows:
 

 Defense counsel: The wounds in the area of the heart would have killed this child very quickly?
 

 Coroner: No, sir. That's the sad part, it wouldn’t have. I think she suffered for awhile, because — the reason I say that is because the injuries that she has involving the heart, as well as the lungs — if you were to be shot in the chest with a shotgun, you have ten seconds worth of oxygen in your brain. I mean, that’s without a heart. And the heart is a thick muscle. The heart is like an inner tube. If any of you have ever had a puncture proof inner tube, the heart is a lot like that, where you poke a hole in it and it has a tendency — the thick muscle wall closes. So, I think that she was alive for a period of time. How long, I don't know. It all depends on the duration and the time span between the stab wounds.
 

 [[Image here]]
 

 Defense counsel: So, a four-year-old child with five stab wounds to the heart itself, you’re saying would survive for some time?
 

 Coroner: Yes, sir. Absolutely.
 

 Vol. 41, p. 10224-10225.
 

 [185]
 

 . In forty-five of those cases, the defendant was allowed to plead guilty to first degree murder with a life sentence, or to a lesser-included offense. In three other cases, the bills of indictment were amended to second degree murder and proceeded to trial on that charge. Of those three second degree murder prosecutions, juries found two of the defendants guilty as charged; the other defendant was found to be not guilty.
 

 [186]
 

 . One prosecution resulted in a determination that the defendant was not guilty by reason of insanity.
 
 State v. Richard,
 
 14th JDC Docket No. 3209-79.
 

 [187]
 

 .
 
 State v. Langley,
 
 1995-1489 (La.4/14/98), 711 So.2d 651,
 
 opinion after remand,
 
 1995-1489 (La.4/3/02), 813 So.2d 356,
 
 State v. Langley,
 
 2004-0269 (La.App. 3 Cir. 12/29/04), 896 So.2d 200;
 
 disapproved of by,
 
 2006-1041 (La.5/22/07), 958 So.2d 1160;
 
 State v. Cisco,
 
 2001-2732 (La. 12/3/03), 861 So.2d 118,
 
 cert. denied,
 
 541 U.S. 1005, 124 S.Ct. 2023, 158 L.Ed.2d 522 (2004).
 

 [188]
 

 .
 
 State v. English,
 
 367 So.2d 815 (La.1979);
 
 State v. Sylvester,
 
 400 So.2d 640 (La.1981);
 
 State v. Perry,
 
 420 So.2d 139 (La.1982),
 
 cert. denied
 
 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983);
 
 State v. Dugar,
 
 527 So.2d 307 (La.1988);
 
 Dugar v. State,
 
 615 So.2d 1333, 1334 (La.1993);
 
 transferred to,
 
 1993-718 (La.App. 3 Cir. 10/5/94), 643 So.2d 870,
 
 writ denied,
 
 1994-2712 (La.6/30/95), 657 So.2d 1019;
 
 State v. Cross,
 
 1993-1189 (La.6/30/95), 658 So.2d 683,
 
 overruling recognized in State v. Juniors,
 
 2003-2425 (La.6/29/05), 915 So.2d 291,
 
 cert. denied,
 
 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006);
 
 State v. Mitchell,
 
 1994-2078 (La.5/21/96), 674 So.2d 250,
 
 cert. denied,
 
 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996).
 

 [189]
 

 .
 
 State v. Martin,
 
 1993-0285 (La. 10/17/94), 645 So.2d 190,
 
 cert. denied,
 
 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).
 

 [190]
 

 . In addition, the defense contends the state has failed to include several first degree murder prosecutions in its listing of cases. We agree there are possible omissions in the state's Sentence Review Memorandum. However, these omissions do not significantly impact our analysis here, considering the
 
 *1087
 
 dearth of comparable cases within this jurisdiction where the victim was a young child killed during the perpetration or attempted perpetration of an aggravated rape.
 

 [191]
 

 . Forty-four of the sixty-eight indictments for first degree murder involved an aspect of robbery or a drug-related offense.
 

 [192]
 

 .
 
 See State v. Giovanni,
 
 375 So.2d 1360 (La.1979);
 
 appeal after remand,
 
 409 So.2d 593 (La.1982), a husband and wife were shot in their home and the house was set afire. Their infant son perished, as well, but the evidence that the infant was also shot was inconclusive. The juiy returned with a verdict of guilty as charged on three counts of first degree murder and sentenced the defendant to life. In
 
 State v. Larson,
 
 579 So.2d 1050 (La.App. 3 Cir. 1991),
 
 writ denied,
 
 588 So.2d 1110 (La.1991), the defendant, who was babysitting a 17 month old infant, was charged with first degree murder in connection with the child’s death. At trial, the defendant claimed he had tripped and fallen down stairs with the child, accounting for the child's injuries. A jury convicted the defendant of manslaughter. In
 
 State v. Trahan,
 
 14th JDC Docket No. 10277-91, the defendant was indicted for first degree murder but was allowed to plead guilty to cruelty to a juvenile. The evidence showed the defendant suffocated the victim while holding the victim too tightly in an attempt to stop the infant from crying. In
 
 State v. Langley, supra,
 
 the state contends the defendant ejaculated into the mouth of the 6 year old victim, strangled him, then stuffed the victim's body in a closet.
 

 [193]
 

 . The CSIR additionally shows he committed the offense of possession of stolen things, for which he was adjudicated delinquent in 1989; the offense of remaining after forbidden, for which he received a disposition of six months probation in 1989; and the offense of theft, for which he was adjudicated delinquent in 1990.
 

 [194]
 

 . Uniform Capital Sentence Review, Section D(7), “General Considerations.”